Ruffin, Chief Justice,
 

 having stated the case as above,
 
 *164
 
 proceeded: — The right of the prisoner to his discharge on the one hand, and the propriety of putting him on his deliverance before a second jury on the other hand, have been fully discussed by counsel for the prisoner, and by the Attorney General for the state, before myself and both of my brethren: and I am delegated to pronounce our unanimous opinion, founded upon very deliberate consideration, that the prisoner cannot be tried again, but is entitled to his discharge, in the same manner as if he had been acquitted by the jury.
 

 The correctness of this opinion depends principally, if not entirely, upon a proper understanding of the facts, and the inferences from them, which are stated in the record, as the grounds of the order for the discharge of the jur)r. We premise, therefore, that it seems clearly to us, that the judge of the Superior Court did not act upon the idea of the state of the health of the two jurors being such as to destroy or impair their capacity bodily or mental, for duly considering the prisoner’s case, and coming to a verdict satisfactory to themselves; or of its being such as to render longer confinement on the jury, with the refreshments and attendants allowed by law under the sanction of the court, likely toendanger the Iivesof the jurors, or probably produce great or lasting injuries to their constitutions. Indeed the affidavits of the jurors fall far short of presenting such a case, and much less are they sufficient of themselves to establish it without any judgment of the court given in the record on the affidavits as evidence. His Honor refraining from pronouncing any such decision of his own upon the evidence, proceeds in his discretion, to discharge the jury: being of opinion that it was in law a matter of discretion, it is probable that he purposely withheld his judgment as to those facts; nay it is yet more probable, from the evidence set forth, that in his judgment, the jurors were not in fact incapable or unable to proceed in the trial, and for that reason he did not find those facts in the record.
 

 Certain it is, that the facts are not stated as having been found by the court, but only the testimony of the jurors; and it is stated that the order was made in the exercise of the discretion of the court. Discretion is evidently used
 
 *165
 
 in contrast and contradistinction to necessity; and the evidence was inserted in the record, not for the purpose giving legal validity to the order, but for the purpose of preserving a memorial of the ground of it, and to show that it was a discreet and not an arbitrary order. Even if the power to discharge a jury be discretionary in the court, it ought certainly to be exercised with great caution, and only under urgent circumstances, denoting at the least, great inconvenience in proceeding in the trial; and a judge honestly assuming a responsibility, naturally desires that the evidence of the reasons for his act, whether adequate or inadequate, should be as permanent as the evidence of the act itself. Our conclusion, therefore, from so much of the record as speaks of what was done in the Superior Court, or by that court touching the discharge of the jury, is, that the judge ordered the discharge, and intended to say that he ordered it, not upon any necessity, but as being a thing within his discretion; and because this was a proper case for the exercise of this discretion upon his official responsibility. No doubt it was thus expressed in the record, that the question might be distinctly presented, whether this be a discretionary power of the judge presiding at a trial or not; and for the purpose of saving to the prisoner the benefit of the law, if his Honor should be mistaken as to the nature of the power. Our conclusion is further confirmed by the language of the judge in assigning his reasons for remanding the prisoner. He refers to
 
 Spier’s case,
 
 and states his wish to have the doctrine laid down in it reviewed; and in his hope that it will be reversed, it is manifest from the dissimilarity of the two cases, that the allusion was not to the point decided in
 
 The matter of Spier,
 
 1 Dev. 491, but to the doctrine discussed by the judges, and the general reasons which led to the particular decision. In that case, the jury was not discharged by the court, but the term of the court expired, so that the jury could not give a verdict. In the present case the court discharged the jury, and without any such cause, which cannot indeed exist, since the act of 1830. Our understanding therefore is, that the record presents, and was intended to present, but the single question before
 
 *166
 
 mentioned — whether a jury charged in a case of capitai felony, can be discharged before rendering a verdict at the discretion of the court, and the prisoner again put on his trial before another jury
 
 1
 
 We think that there is no such discretion; and that the jury cannot be disdharged fwithout the prisoner’s consent, but for evident, urgent,, overruling necessity, arising from some matter occurring during the trial, which was beyond human foresight and ^control; and generally speaking, such necessity must be set forth in the record.
 

 For this principle, and for almost the words in which we lay it down, we are indebted to
 
 Spier’s case.
 
 The whole scope of the reasoning of the judges, who delivered their opinions upon that occasion, is decidedly and warmly against such a discretion, as being contrary to the common law, and iso dangerous to the liberty and security of the citizen, that the doctrine ought not to receive the least countenance in the courts of this country. Certain exceptions, founded upon necessity, and already established by judicial decisions, are recognized in that case, and a willingness is professed to admit others founded upon a reason alike forcible and conclusive. But Chief Justice Taylok, says, “ that all the exceptions ought to be confined to those cases of extreme and positive necessity which are dispensed by the visitation of God, and which cannot, by any contrivance of man, be made the engines of obstructing
 
 that
 
 justice, which the safety of all requires should be done to the state, or weakening the efficacy of, or rendering illusive that maxim of civil liberty, of which the prisoner claims the benefit.” In applying the doctrine thus expressed, the court there refused to incorporate into the law, as an exception to the ancient rule, the case of the term expiring before the trial was had, and as far as appeared, could have been completed. These principles we are now called upon to overturn, as being unsound in themselves, and condemned by those who view the subject in the better lights of the present day. It is, in our opinion, a bold and hazardous assumption in judges, to change and upset settled law, under the pretext that it was adopted in a state of society to which it was suitable, but that cir
 
 *167
 
 cumstances have now so varied, and the opinions of naan-kind so changed, that the rule has become inconvenient and unsuitable, and ought therefore to be altered. If the law were unalterable, but by judicial decisions, the argument would be full of force. It is true, that the exigencies of society have, from time to time, obtained, in some instances, judicial modifications of ancient rules of law, but this has been effected by slow and almost imperceptible degrees, and without a recurrence, at those times, to first principles, until a succession of inadvertent departures from the old rule, have so strongly established exceptions to it, that a court subsequently reviewing the whole ground, finds it more difficult and dangerous to attempt to re-establish the principle in its integrity, by retracing the steps of those who had lost sight of it, than to receive and enforce the rule, with its exceptions, all as they came down to us. But a wilful disregard of a clear maxim of the common law, found in the works of those reverend authors, to whom, as the fathers of that law, appeal is made for its text, and promulgated through the recorded decisions of our predecessors, as its professors and ministers, is almost, if not entirely, as indefensible, as the like disregard of the injunctions of a statute. The legislature may pass an unwise law, one in conflict with the usages of the country, and incompatible with its enlarged and varied interests; it is still the law; and a judge cannot abrogate it, by construction, upon the ground that it was, or has become impolitic; neither can he rightfully counteract a positive precept of unwritten law, sanctioned by adjudications for ages past, upon the ground that the sages who established it, could not foresee our condition, and therefore, that succeeding judges must either retreat or advance, to suit the times. Courts cannot thus change their position, and frame anew original rules of law, or introduce exceptions not before found, either in terms or in principles. We must say, therefore, that the doctrine and decision in
 
 Spier’s case,
 
 are deemed by us as conclusive authority upon the question before us. It is true that it was not a judgment of the Supreme Court as a court, because the case was not an appeal, but upon a
 
 habeas corpus,
 
 on which the Judges
 
 *168
 
 had only the power which any other judges, or a single judge, possessed. The superior authority of the case rests upon the number of judges called to its decision, and the opportunities for full discussion at the bar and on the bench, consultation and deliberation; all of which took place. We believe few questions were more anxiously considered by the judges of that day, than those involved in that case were; and for the correctness of the judgment, the main reliance of the judges is upon the maxim of the common law, as lying at the foundation of the security against injustice and persecution, provided by that law for the innocent. But the respect to be shown to that case by no means depends alone on its authority as a solemn decision, nor on the intrinsic excellence of the argument of the judges. It has subsequently been judicially recognized and sustained: and, moreover, not only acquiesced in, but in a remarkable manner, incidentally approved by the legislature. It is certain, that before
 
 Spier’s case,
 
 which was decided in July, 1828, prisoners had in several instances, been remanded to prison by the judges on the Circuit, when the term expired before a verdict was given, and had been put on their trial again at a subsequent term. Such cases had occurred within my own experience, while at the bar; and when on the Circuit bench, I had more than once adopted the same course. But to me certainly, and to any one of the other judges thus acting, as far as I heard, or had the least reason <o suppose, this was not on the idea that it was in the discretion of the court to discharge the jury, and retry the accused, or not to do so. We did not discharge the jury— the law itself dissolved the court, and necessarily released and dispersed the jury. I never knew a jury in a case of felony, to separate by leave of the court, until the court had no power to keep them together; nor has a tradition of such a practice at any time, in this state, reached us. As the capacities and legal existence of the jury were lost by the efflux of time, under the operation of law, that was considered to be a case of legal and physical necessity, which rendered it impossible for the jury to ascertain either the guilt or innocence of the prisoner, and for that reason we
 
 *169
 
 conceived that we were not merely at liberty to bring him to trial again, or not, as might seem to us meet, according to the circumstances, but that we were obliged so to do. So far from its then being deemed a matter of
 
 discretion,
 
 it was thought the court had
 
 no
 
 discretion whatever upon the subject, but was
 
 bound
 
 to proceed to a second attempt to obtain a trial, the first having, from necessity, proved altogether ineffectual. It is not to be denied, that for reasons like these, the point ruled in
 
 Spier’s case,
 
 was not satisfactory to the profession; and nearly concerning, as it did, the public justice, as well as the integrity of the trial by jury, and the security of the citizen, it attracted very general attention. At the succeeding session of the General Assembly, a bill was introduced to correct the supposed evils of the decision, by authorizing the party to be put again on trial. Instead thereof, a proposition, by way of amendment, was offered, that the term should be prolonged some certain days, for the purpose of taking the verdict. But it was found to be so invested with difficulties, touching the rights of the accused, and with inconveniences, from the loss of the court in an adjoining county, while the judge was awaiting the action of the jury, who might even then not be agreed within the enlarged, but limited period, that the whole subject was postponed, without any final action upon it.
 

 In this state the question was, when the first change in the members of this court occurred, upon the demise of Chief Justice TayloR. Upon my succeeding him in December 1829, it was immediately revived in the
 
 Matter of Peter Slaughter.
 
 The case is not reported, but the prisoner was brought before all the judges of the court on a
 
 habeas corpus
 
 from Anson, in June term 1830. The facts were, that the jury was empannelled on Thursday morning of the term, retired to consider of their verdict on Friday night, and fifty minutes before twelve o’clock on Saturday night, upon being sent for by the judge, declared that they had not agreed, and could not agree; whereupon, the the court, as the term was expiring, remanded the prisoner and discharged the jury. The case was elaborately argued for the prisoner by my brother Gaston, who had
 
 *170
 
 also been of counsel for
 
 Spier;
 
 and for the state, by his Honor Judge Saunders, then the Attorney-General. All the authorities cited in the first case, were re-examined, and every other which research could discover, was adduced ; among-them were the
 
 United States
 
 v.
 
 Perez,
 
 9 Wheaton, 579 ; and the
 
 Commonwealth
 
 v.
 
 Thompson,
 
 in the General Court of Virginia, in 1813, which is found in 2d Wheeler’s Criminal Cases, 478. The latter case was precisely in point with
 
 Spier’s.
 
 The jury separated at the end of the term, without any order by the court; upon which case, the General Court, eight judges being present, was of opinion, unanimously, that inasmuch as the judge did not undertake of his own authority to discharge the jury, but had kept them together the full legal term of the court, and they were then necessarily separated by law, the prisoner was not discharged from further prosecution. In the case of
 
 Perez,
 
 besides others in several of the state courts in this country, the power of the court in its discretion to discharge the jury, is certainly recognized in its greatest extent; and it was upon the authority of those cases, zealously contended for by the attorney-general in
 
 Slaughter’s case;
 
 but we were all agreed that there was no such discretionary power in a case of felony, known to the common law of England in its ancient purity, nor as administered in the more modern times of an independent judiciary; and that nothing short of an apparent, flagrant and uncontrollable necessity, would justify such discharge, and authorize a second trial. Although the doctrine of this discretion has been thus promulgated by some of the American courts, it is remarkable that not a single instance of its exercise or assertion, can be found in the English books, since a period was put to an arbitrary prerogative, and judicial servility, by the expulsion of the Stewarts. Since the revolution in 1688, a jury has not been discharged in that country, except upon an absolute disability of the prisoner to conduct his defence; as if he became insane, or suddenly ill during the trial; or the inability of the jury from like causes, to proceed in the trial; or other similar physical necessity and dispensation of Providence,
 
 *171
 
 except it be on the side of mercy, for the benefit, and at the request, or at least by the consent of the prisoner, as in the
 
 Kinlock’s case.
 
 It is a discretion not only momentous to the accused, but of all others, tending most directly to bring upon the administration of justice, and the ministers of the law, suspicion and odium; and that at the very period when a general sense of the purity and impartiality of the judicial tribunals is most necessary to their efficiency, and to calming and satisfying the public mind. At present the judges of the United States, may discharge juries, without alarming the fears of the profession, or exciting the jealousy of the people ; but if it should happen that in times of fierce faction and political troubles, such a step should be taken in prosecutions instituted by high executive officers, or in which they have a personal concern ; or for treason growing out of extensive sectional commotions, and perpetrated by a forcible resistence to the execution of a law, supposed to be peculiarly oppressive to a large section of the country, the bar, ever sagacious in descrying danger, sensitive to the abuse of power, and prompt and bold in defence of liberty, would be aroused, and the country at large agitated to its extremities.
 

 The power is not necessary or useful to public justice, for if twelve men indifferently chosen, after full argument upon the evidence, and instruction from the court upon the law, and opportunity for full deliberation, be not agreed of the guilt of the accused, he ought to be acquitted. The law anticipates a verdict in every case; and although from the constitution of the human mind, it cannot be supposed that the evidence will make the same impression upon every juror, yet it is probable that by consultation, they will ultimately come to the same conclusion; if tono other, that the whole jury, upon the fair and invincible doubts of a part of their body, will adopt one favourable to the prisoner, since in a case of real doubt, the law leans to the presumption of innocence. There is therefore no foundation for the notion of a
 
 moral necessity,
 
 for the discharge of a jury on account of a
 
 moral disability,
 
 as it is called, on the part of the jury to make up their minds
 
 *172
 
 alike, and agree on a verdict, after a
 
 reasonable
 
 period for consultation. It is doubtless a relief to the jury, to be freed from longer confinement and privation, which is the consideration from which this practice seems chiefly to have grown up. So it would be in a still greater degree, if they were not called to this service at all, for it is a severe one; and no duty can be more painful, than that of pronouncing a sentence which cuts off the life of a fellow man. Probably its painfulness causes, in numerous instances, the occasions for the discharge of juries, since they have been told that the court can discharge them upon their own allegation of moral disability. But it is not to the ease of the jury in these respects that the law has regard, but to the administration of its own justice between the public and the prisoner, in a manner safe for the former, and securing the latter from prolonged and repeated prosecution. For these reasons in
 
 Slaughter’s
 
 case, my senior brethren, Chief Justice Henderson and J udge Ham,, in affirmance of the decision in
 
 Spier’s
 
 case, discharged the prisoner. In the general doctrine, I concurred throughout. I own I did not unite in the order; but it was entirely because I thought the reasoning not applicable to the particular case. I still retained the opinion, that if a trial be going on in a court whose term is limited by law, and expires before the trial can be gone through, it was a case in which inevitable necessity, in legal contemplation, prevents a verdict from being given. There may indeed be cases, and in modern times they are not unfrequent, which would occupy the whole of one of our terms ; and if the failure to conclude them within it by verdict would acquit the accused, they could easily, though unnecessarily, be made to consume the whole term. I deemed it however a fair and a legal presumption, that the court and the jury honestly endeavoured to perform their duties, and that the trial was not finished because it could not be. I did not think the prisoner ought to be tried again, because the jury did not after deliberation acquit him, but because the jury had not the opportunity for full deliberation, and were deprived of it, not by the power of the judge, but by the operation of the law; on
 
 *173
 
 the other hand, the other judges thought that by continuance the trial might be spun out till the expiration of the term, and that the admission of this exception to the ancient and approved rule, might be thus used, as the means of helping out a defective case, upon a second trial; and as an instrument of oppression to a prisoner; and as the inconvenience admitted of remedy, by enlarging the terms of the courts, they chose to leave it to the legislature to change the law, on the side that might seem to it best, rather than adopt of themselves a principle that might put the innocent in jeopardy. Of course I then felt that in a judicial capacity, I was concluded as to the law upon this point, and have ever since yielded my assent to this application of the rule. It became, however, absolutely necessary that the legislature should interpose in some way, otherwise many offenders would escape, and justice to suitors be obstructed by trials for felonies, in which the prisoners would run against time. It was open to the legislature, to confer on the courts the general discretion to discharge one jury and empannel another; or if actuated by the reasons which governed my opinion upon the particular question, to enact that a prisoner should be tried at a subsequent term, if a jury charged with him at a former term, did not give a verdict before the expiration of the term; or to enlarge the term, so as to give all possible opportunity for the first jury to make up and render a verdict. The last of these three, is the remedy provided in the wisdom of the legislature, by the act of 1830, c. 22, “For the more perfect administration of justice in capital cases;” which authorizes the judge to adjourn the court from day to day, indefinitely, for the purpose of finishing the trial, and rendering judgment in a capital case commenced previous to the expiration of the regular term. It must have been obvious to the General Assembly, that this method might often prove highly inconvenient in breaking in upon the subsequent court or courts of the circuit. It therefore would not have been surprising, if it had been declared that a failure of the jury to render a verdict either way during the term, should not be an acquittal. But so strong was the suspicion of improper
 
 *174
 
 practices to protract the trial, and to prevent a verdict, which might be as well on the one side as the other, that the legislature preferred the inconvenience of delaying justice in the adjoining counties, to the probable mischief of corrupting and perverting it in the momentous cases of capital felonies; much more must they have preferred it to the entire abolition of that humane, safe and sound maxim of the common law, which commands the judge to keep the jury together until they be agreed of their verdict, and denies to him the
 
 discretion
 
 to discharge them. For if the legislature refused to sanction or allow an exception to that maxim, in the strongest possible case that can be imagined, for admitting any exceptions, namely, when the court was
 
 prevented by the law itself,
 
 from performing the duty of keeping the jury together, the inference is irresistible, that they deemed the rule itself to be in the highest degree salutary; and meant to preserve it inviolate from their own acts, and yet more from the encroachments of the judiciary. Since then, the jury are to be kept together until they be agreed, they
 
 must
 
 agree, at least in a capital case. This is not deemed impossible in any case; — nay it is deemed certain for the reasons before drawn from the just and legal presumption to be deduced in a case of this grade, from doubts of the prisoner’s guilt. To this confinement of the jury there is no limit, but that which arises from the apparently utter impossibility for attaining the end for which the jury is to be kept together — the unity of their opinions. That impossibility is not apparent, until by mental alienation or bodily disease, .suddenly dispensed by Providence, or induced by exhaustion from long confinement and privation, a juror becomes incapable of further
 
 discussion
 
 and deliberation. When such becomes the state of facts,
 
 there is a necessity
 
 for the discharge of the jury ; first, because we have no right to keep in peril the life of the juror; and secondly, because his mind cannot yield its assent to the verdict pronounced in his name.
 

 Having thus brought down the history of this question in this state, we may safely inquire for any question that has ever been seriously debated, upon which a judge is
 
 *175
 
 more perfectly concluded by authority. We think there cannot be one in which we would be less at liberty to act on any speculative reasons of convenience or justice of our own ; but we must be permitted at the same time to declare* that had we now to choose for the first time between the discretion of the judge, and the fixed principles of the common law, forbidding the discharge of a jury in a capital case, except by necessity, physical or legal, we should, upon
 
 principle,
 
 unhesitatingly adopt for ourselves and our posterity, that which we now enjoy by descent from our forefathers. We cannot change this law. Chief Justice Taylor may have been mistaken in thinking, as he did in
 
 Spier’s Case,
 
 that the rule then established must be that for all posterity, unless the legislature should think proper to interfere; and there may hereafter be judges, who, without such interference, will advance to the change from law to discretion upon this point; but it will most assuredly not be in our day. We abide by the law as we find it established in remote antiquity, acted on in the purest periods of English liberty, and enforced by our predecessors in the places we now occupy.
 

 Lest it should be supposed that the case which happened upon the trial of the prisoner falls within the rule as acknowledged by us, and therefore that he was remanded properly, though not upon the reason awarded by his Honor, it is necessary to remark, that as to matters of fact, we can look only to such as are set forth in the record
 
 as fads.
 
 A record imports absolute verity as to all matters which are stated in it as occurrences on the trial, because the law reposes entire confidence in the integrity of the court. The judge presiding, and he alone, can know, whether the proof offered before him to establish a fact as then existing, is true, and therefore the special matter set down by him is conclusive; and no other court or judge can weigh the credibility of the witnesses, and infer one fact, from another that was proved. It is certain to us, for instance, that the two jurors deposed as is stated, to the condition of their health; but if they had even sworn that they were reduced to impending dissolution, the truth of that allegation would not thereby appear to us, but
 
 *176
 
 only to the judge presiding, who had it in his power to adopt various other means — such as advice of professional men, his own inspection, and the like, to satisfy his mind. If, therefore, the record had set out as fact, that one of the jurors had become so diseased as to endanger his life, or render a permanent injury to his health highly probable; that he had thereby become unfit or unable to serve longer on the jury, the fact would be established by the record, although no evidence appeared thereon in proof of the fact: so, on the other hand, when the record states the evidence only, the fact is not established by the record ; and being a fact occurring in a proceeding in a court of record, it can be established by no other evidence. We have therefore abstained entirely from considering the testimony of the jurors in reference to the conclusions that might be drawn from it; for if it did not satisfy us that the jurors were unfit or incapable of longer service, we could not contradict the record, if it had stated that fact to be the other way. Our decision is therefore founded upon this, that the record shows that the jury was discharged without, in explanation thereof, showing any state of facts from which the discharge becomes
 
 necessary.
 
 This is indispensable, because by no other means but the record, can the necessity appear, and by that it can always be made to appear, with the single exception of the sudden insanity or death of the judge during the trial — a case not yet decided, and which may probably found another exception, upon necessity, to the general rule.
 

 Upon the whole, therefore, we are clearly of opinion, that the prisoner must be discharged upon the payment, by his master, of such costs as he is legally liable for, and upon his entering into recognizance for the appearance of the prisoner at the next term of the Superior Court, to answer any other charge the state may have against him.