STATE OF NORTH CAROLINA v. STANLEY SANDERS

No. 88A85-3

(Filed 6 March 1998)

### 1. Criminal Law § 548 (NCI4th Rev.)— capital sentencing— juror misconduct—mistrial

The trial court did not err by declaring a mistrial in a capital resentencing proceeding for manifest necessity based upon the cumulative effect of acts of juror misconduct where the record shows that, contrary to the trial court's instructions that the jury was to consider the law as instructed by the court and the evidence heard in court and nothing else, the jurors were discussing extraneous matters, including parole eligibility, a juror's outside investigation on the meaning of life imprisonment, evidence at defendant's previous trial, and whether one juror believed in the death penalty; inappropriate conduct was directed toward one juror when several other jurors told her that she was not capable of continuing deliberations, that she should request the judge to replace her, and that they hoped that she or "anybody in [her] family will be [defendant's] next victim"; and one juror misrepresented to other jurors that she had spoken with police officers and a judge concerning the definition of life imprisonment.

### 2. Constitutional Law § 225 (NCI4th)— capital sentencing— mistrial—juror misconduct—new sentencing proceeding— not double jeopardy

Where defendant's capital sentencing proceeding ended with a mistrial declared for manifest necessity, defendant's right to be free from double jeopardy will not be violated by a further sentencing proceeding.

### 3. Criminal Law § 521 (NCI4th Rev.)— capital sentencing— mistrial—juror misconduct—sufficiency of court's findings

The trial court's findings of fact, along with an examination of the record, provided ample support for the trial court's finding of manifest necessity warranting a mistrial in defendant's capital sentencing proceeding based on juror misconduct and sufficiently complied with N.C.G.S. § 15A-1064, although the trial court did not set out each instance of juror misconduct.

STATE v. SANDERS

[347 N.C. 587 (1998)]

### 4. Criminal Law § 516 (NCI4th Rev.)— capital sentencing— juror misconduct—mistrial—exploration of alternative remedies

The trial court properly explored alternative remedies before declaring a mistrial based on juror misconduct in defendant's capital sentencing proceeding where the court, after receiving information that the jury was discussing extraneous matters, gave the jury curative instructions and an opportunity to resume proper deliberations and continue the sentencing proceeding to conclusion; after the jury deliberated for an additional twenty minutes, it became apparent to the trial court that the jury had disregarded its instructions and was once again discussing extraneous matters and failing to focus on the issues at hand; and the trial court then determined that a mistrial was the appropriate remedy.

Justice FRYE dissenting.

Justice WEBB joins in this dissenting opinion.

On defendant's petition for writ of certiorari to review an order entered on 16 October 1995 by Lamm, J., in Superior Court, Transylvania County, declaring a mistrial, and an order entered on 8 March 1996 by Warren, J., in Superior Court, Transylvania County, denying defendant's plea in bar and motion for imposition of a life sentence. Heard in the Supreme Court 16 October 1997.

*Michael F. Easley, Attorney General, by Ellen B. Scouten, Special Deputy Attorney General, for the State.*

*James R. Glover for defendant-appellant.*

ORR, Justice.

Defendant was convicted of first-degree murder, first-degree rape, felonious breaking and entering, and felonious larceny on 1 July 1982. Based on the jury's recommendation, defendant was sentenced to death for the first-degree murder conviction and appealed to this Court. In a *per curiam* opinion, this Court vacated the judgments and remanded for a new trial because of "the entirely inaccurate and inadequate transcription of the trial proceedings." *State v. Sanders*, 312 N.C. 318, 319, 321 S.E.2d 836, 837 (1984) (per curiam) (*Sanders I*). Following the new trial and capital sentencing proceeding, defendant was again sentenced to death.

STATE v. SANDERS

[347 N.C. 587 (1998)]

On 7 April 1987, this Court entered an order remanding to the trial court "for the sole purpose of hearing defendant's motion to suppress the evidence taken from his residence." *State v. Sanders*, 319 N.C. 399, 400, 354 S.E.2d 724, 725 (1987). After further briefing and argument by the parties, this Court found no error in the hearing on defendant's motion to suppress or in the guilt phase of defendant's trial. However, because of *McKoy* error, the case was remanded for a new capital sentencing proceeding. *State v. Sanders*, 327 N.C. 319, 395 S.E.2d 412 (1990) (*Sanders II*), *cert. denied*, 498 U.S. 1051, 112 L. Ed. 2d 782 (1991).

On 9 October 1991, based upon defendant's motion for a change of venue, the trial court entered an order transferring venue from Transylvania County to McDowell County. Defendant's third capital sentencing proceeding was held at the 11 September 1995 Criminal Session of Superior Court, McDowell County. On the second day of deliberations, the State moved for a mistrial, and Judge Charles C. Lamm, Jr., orally granted the motion. Judge Lamm subsequently entered a written order on 6 October 1995, declaring a mistrial based on juror misconduct. This order was filed on 16 October 1995. On 16 February 1996, defense counsel filed a "Plea in Bar and Motion for Entry of Life Sentence or Motion for Continuance of Trial Date." Judge Raymond A. Warren denied defendant's "plea in bar for the entry of an order cancelling the penalty phase trial and imposing a life sentence" and allowed defendant's motion for a continuance. Defendant then filed a petition for writ of certiorari with this Court and requested that we review the orders entered by Judge Lamm and Judge Warren. This Court allowed defendant's petition on 10 October 1996.

A detailed review of the evidence introduced during the guilt phase of defendant's trial is set forth in the prior opinion of this Court, finding no error in that phase of the trial. *Sanders II*, 327 N.C. 319, 395 S.E.2d 412. Further discussion of the evidence introduced during that trial is unnecessary here.

[1] In the present case, defendant contends that the trial court erred by granting the State's motion for a mistrial over defendant's objection, thereby violating his constitutional right to be free from double jeopardy. Defendant argues that (1) nothing occurred during jury deliberations which constitutes "manifest necessity" for granting a mistrial, (2) the trial court failed to adequately identify the alleged juror misconduct in its findings of fact, and (3) the trial court erred

**STATE v. SANDERS**

[347 N.C. 587 (1998)]

by failing to explore alternative remedies which could have permitted the sentencing proceeding to continue to final conclusion. We disagree with defendant's contentions and affirm the orders of the trial court.

In the present case, the jury began sentencing deliberations on 4 October 1995 at 10:45 a.m. That same day at 4:00 p.m., the jury sent the trial court a written question which stated, "How do we as a jury, when one or more of us have questions regarding facts of the case (feel we have not been given enough information)[,] deal with finding the facts or coming to an undecisive [sic] conclusion[?]" After conferring with counsel, Judge Lamm brought the jury out and questioned the foreman as follows:

> THE COURT: Sir, without telling me—if the jury has answered one or more issues already, without telling me what the answer to that issue is; if you could tell me, is this question relating to a specific issue or issues?
>
> FOREMAN: It's on the Issue Three.
>
> THE COURT: On Issue Three?
>
> FOREMAN: Yes, sir.
>
> THE COURT: Okay, sir. Do you wish to be instructed again on Issue Three and Issue Four?
>
> FOREMAN: Yes, sir.

Before instructing on Issues Three and Four, the trial court first reminded the jury that "the state must prove three things beyond a reasonable doubt" before the jury can recommend a sentence of death. The trial court also defined "reasonable doubt" for the jury and gave the pattern jury instructions as to the three things the State was required to prove beyond a reasonable doubt. It then gave the pattern jury instructions pertaining to Issue Three, which provides, "Do you unanimously find beyond a reasonable doubt that the mitigating circumstance or circumstances found is, or are, insufficient to outweigh the aggravating circumstance or circumstances found?" and Issue Four, which provides, "Do you unanimously find beyond a reasonable doubt that the aggravating circumstance or circumstances you found is, or are, sufficiently substantial to call for the imposition of the death penalty when considered with the mitigating circumstance or circumstances found by one or more of you?" After receiving these instructions, the jury resumed deliberations at 4:20 p.m.

At 5:05 p.m., Judge Lamm excused the jurors for the day and stated that they would begin deliberations again the next morning at 9:30. Prior to sealing the jury's Issues and Recommendation as to Punishment form and notepad, Judge Lamm noted that there was a folded piece of paper on top. Several jurors indicated to Judge Lamm that the paper contained another question for him but that they were not through framing the question. Accordingly, Judge Lamm agreed to address the question in the morning once the jurors were ready.

The next morning, prior to returning to deliberate, Judge Lamm asked the foreman to tell him how long the jury had been deliberating on the issue that it was currently deciding. The foreman told Judge Lamm that the jury had been deliberating on the issue since sometime after the lunchtime meal, that three votes had been taken, and that the split for the last vote was "a little bit different." The foreman then indicated that the jury would continue deliberations, and the jury in fact resumed deliberations at 9:49 a.m.

At approximately 10:15 a.m., Judge Lamm was handed another piece of paper by the jury. This note stated, "We have a vote of 11-1. Hung jury on the final issue." Judge Lamm then called the jury into the courtroom and asked the foreman to tell him whether the jury was referring to Issue Four when it referenced the "final issue." The foreman informed Judge Lamm that the jurors had begun deliberations on Issue Four that morning. Judge Lamm requested that the jury deliberate further on that issue to see if it could reach a unanimous decision. Jury deliberations resumed at 10:25 a.m.

At 10:55 a.m., Judge Lamm was handed another note by the jury, which included the following statements:

We can not come to a unanimously [sic] decision on Issue Four.

We had a[n] error at one point and went ahead and signed it but we reread recommendation as to punishment.

We need to know if life means life in prison.

We [have] one juror who . . . investigat[ed] on her own and talked to a judge and police officers.

After a brief recess, Judge Lamm met with counsel for both parties, in defendant's presence. Both counsel were informed of the contents of the note set out above. Judge Lamm also informed counsel that the note which was received at approximately 10:15 a.m. stated, "We have a vote of eleven to one," and that under that it read, "Hung jury

on the final issue." Finally, he also stated that the folded-up piece of paper which had been sealed the previous night made some reference to the eleven to one vote on Issue Three.

Defense counsel then requested that the trial court rule that the jury was unable to reach a unanimous verdict and enter a sentence of life imprisonment as required by statute. N.C.G.S. § 15A-2000(b) (1997). The trial court denied this request. Defense counsel also requested that the trial court bring the jurors out and conduct a limited inquiry on "whether or not they believe that further deliberation, without any further instruction, would lead or might lead to a unanimous verdict" and if the answer to that was "no," that the trial court declare that the jury was unable to reach a unanimous verdict. The trial court also denied this request. It should be noted that defense counsel did not object to the trial court's rulings on these requests and has not brought them forward on appeal.

Defense counsel's final request was that the trial court reinstruct the jury on the meaning of life imprisonment. Subsequently, the trial court asked what the State's position was with respect to this request. The prosecutor stated that he believed the jury should be instructed on the definition of life imprisonment, but also noted:

> [W]e simply cannot ignore the last part of that note which facially shows juror misconduct. I don't see how this court can do anything other than, at this point, make an inquiry into that. I don't really know what the procedure is but it has to be done. . . . I think we would have to identify the potentially offending juror and give that person a chance here on the record to admit or deny it. I think the court has to make an inquiry and make a determination; has there been juror misconduct before anything else happens.

The foreman was then brought into the courtroom and questioned concerning the jury's note stating that a juror had spoken with a judge and police officers. The foreman stated that juror number six told the jury that she had been informed by a judge and police officers that life imprisonment meant that the defendant had to serve twenty years in prison. Judge Lamm thanked the foreman for his help and asked him not to repeat the conversation to the rest of the jurors. Defense counsel pointed out that defendant "is facing forty years before he is even eligible for parole so what the juror was told is not true." Defense counsel then requested that the jurors be informed that what they may have heard from an outside source is "neither the

law nor the evidence they heard in this courtroom, and they are bound by the law as given by the judge." Additionally, defense counsel requested that the jury be instructed that "life means life."

After some discussion between the trial court and defense counsel, defense counsel stated, "we do not want the court to declare a mistrial at this point." Defense counsel argued that "defendant has a right to have this jury continue to deliberate." The prosecutor agreed with defense counsel and suggested that the trial court make a further inquiry into the statements made by juror number six.

The trial court then brought juror number six, Renita Lytle, into the courtroom. In response to questioning by the trial court, Lytle stated that she had lied to the jury about talking with anyone concerning the situation. She admitted that she spoke with her nephew, who is a police officer, but said she never asked him about the case. She further stated the following:

> And then I told a lie about the judge because—I mean they was giving—they was making me think that I was dumb and that I didn't have a right to my opinion. . . . I mean yesterday they were like, "You need to get out of here!" I mean, "You don't need to be in here! You need to go tell the judge that I don't belong in here and get one of them alternates to come in and take your place." I mean it was really pressuring me into doing things that I really didn't believe in, and I was feeling hurt and I was feeling sad because they didn't like me for the reason, for my suggestion, and I just didn't—and I couldn't take the pressure and so I figured if I just tell them that, you know, tell them this, then they will just back off and leave me alone and then I'd be out of the case because I could not take the pressure.

Lytle further stated that her understanding of life imprisonment was that "you go to jail and you remain for life." However, she indicated that the other jurors had told her that if defendant received life imprisonment, he would "get out in a couple months." She also stated that the other jurors said that they hoped that she or "anybody in [her] family will be his next victim."

At this point, defense counsel requested the trial court to instruct that life means exactly what the court had previously instructed and to give the deadlocked jury instructions pursuant to N.C.G.S. § 15A-1235. The prosecutor expressed concern that the rest of the jury had been informed by a juror that "she did something

wrong that all of them had been told not to do" and stated he did not believe the jury should continue deliberations.

Once the jury returned to the courtroom, the trial court informed the jurors that he was aware there had been some discussion of the meaning of a life sentence. Judge Lamm also noted that some of the discussions may have been based on "inaccurate information" or "inaccurate occurrences." Judge Lamm then instructed the jurors to eliminate the question of parole eligibility from their minds, that life imprisonment means "imprisonment in the state's prison for life," and further instructed them to reason the matter over without surrendering their conscientious convictions.

At 12:25 p.m., jury deliberations resumed. Twenty minutes later, the trial court received a note from juror number three, which the trial court characterized as "one juror making accusations against another juror." The note to the trial court stated as follows:

1. Is a statement from Juror #6 that because we were not at the last trials for murder and did not know all the facts that she could not vote for the death sentence and didn't know how the rest of us could—Is that reason acceptable to the court?

2. Juror 6 made several statements that basically said she did not believe in the death penalty; however, when pressed on the issue said she did believe in it.

I'm sorry if I'm making trouble for the court, I simply felt I needed to ask these questions. If you don't wish to answer, that is, of course, fine with me.

Thank you,
Juror #3

At this point, defense counsel made the following statement:

Your honor, at this time the defense makes a motion that the court call the jury out into the courtroom and the court inquire of the foreman of the jury if the jury is still deadlocked. If the foreman answers in the affirmative, we believe it is time to take this matter from the jury. They have been deliberating for a period of more than seven hours; they have degenerated into something that is much less than jury deliberations and I think that this is what the statute contemplates when they give the Superior Court Judge the power to take the matter away from the jury. It's time, it's past time.

The prosecutor then renewed his motion for a mistrial. Subsequently, the trial court declared a mistrial based on juror misconduct.

N.C.G.S. § 15A-1062 provides, in pertinent part:

· Upon motion of the State, the judge may declare a mistrial if there occurs during the trial, either inside or outside the courtroom, misconduct resulting in substantial and irreparable prejudice to the State's case and the misconduct was by a juror or the defendant, his lawyer, or someone acting at the behest of the defendant or his lawyer.

N.C.G.S. § 15A-1062 (1997). "Whether to grant a motion for mistrial is within the sound discretion of the trial court and its ruling will not be disturbed on appeal unless it is so clearly erroneous as to amount to a manifest abuse of discretion." *State v. McCarver*, 341 N.C. 364, 383, 462 S.E.2d 25, 35 (1995), *cert. denied*, —— U.S. ——, 134 L. Ed. 2d 482 (1996). "[H]owever, a trial court in a capital case has no authority to discharge the jury without the defendant's consent and hold the defendant for a second trial, absent a showing of 'manifest necessity.' " *State v. Lachat*, 317 N.C. 73, 82-83, 343 S.E.2d 872, 877 (1986).

A manifest necessity exists only when some event occurs at trial creating a situation where the defendant's right to have the trial continue to termination in a judgment is outweighed by "the public's interest in fair trials designed to end in just judgments." *Wade v. Hunter*, 336 U.S. 684, 689, 93 L. Ed. 974, 978 (1949). This Court has recognized two kinds of necessity to justify a mistrial without defendant's consent—"physical necessity" and the "necessity of doing justice." *State v. Birckhead*, 256 N.C. 494, 505, 124 S.E.2d 838, 847 (1962). The necessity of doing justice has been defined as "aris[ing] from the duty of the court to 'guard the administration of justice from fraudulent practices; as in the case of tampering with the jury, or keeping back the witnesses on the part of the prosecution.' " *Id.* (quoting *State v. Wiseman*, 68 N.C. 203, 206 (1873)). It is limited to "the occurrence of some incident of a nature that would render impossible a fair and impartial trial under the law." *Id.*

In discussing the determination of a "manifest necessity," this Court has quoted the United States Supreme Court and stated:

"We think, that in all cases of this nature, the law has invested Courts of Justice with the authority to discharge a jury from giving any verdict, whenever, in their opinion, taking all the circumstances into consideration, there is a manifest necessity for the

act, or the ends of public justice would otherwise be defeated. They are to exercise a sound discretion on the subject; and it is impossible to define all the circumstances, which would render it proper to interfere. To be sure, the power ought to be used with the greatest caution, under urgent circumstances, and for very plain and obvious causes; and, in capital cases especially, Courts should be extremely careful how they interfere with any of the chances of life, in favour of the prisoner. But, after all, they have the right to order the discharge; and the security which the public have for the faithful, sound, and conscientious exercise of this discretion, rests, in this, as in other cases, upon the responsibility of the Judges, under their oaths of office."

*State v. Shuler*, 293 N.C. 34, 43, 235 S.E.2d 226, 232 (1977) (quoting *United States v. Perez*, 22 U.S. 579, 580, 6 L. Ed. 165, 165 (1824)) (alteration in original).

In the present case, the trial court made the following findings of fact and conclusions of law with respect to its decision to grant a mistrial:

Due to the previous occurrences that occurred on the record, the court making no finding or taking everything that has occurred as being true except making no finding as to the truth or falsity of the responses to the court's inquiry of the foreperson, Mr. Woody, with regard to what Juror Number 6, Mrs. Lytle, said that she did, or what she said;

And without taking as true or false, making no finding of fact with regard to the truth or falsity of Mrs. Lytle's explanation of what occurred in that regard; in regard to the telephone call to her nephew or whether she talked to any other police officers or to any judges;

But taking everything else as being true and finding that further things that Mrs. Lytle said as to the treatment that she received in the jury room for at least a portion of the day yesterday and the emotional state that it put her in when she went home yesterday after being dismissed for the day;

And considering these statements of Juror Number 3, . . . and noting that the characterization of the statement are [sic] allegations as to what one juror is saying or doing and the motive behind what one juror is saying or doing and the position that the juror is taking;

From all of those things, the court concludes as a matter of law; [t]hat at least one and more than likely a number of the jurors are not following the instructions of the court as to their conduct and duties as jurors during deliberations; are not following the law as instructed by the court.

The court concludes that this constitutes juror misconduct and for that reason, the court declares a mistrial in this case.

Juror misconduct encompasses a wide range of improper activities. Thus, it is appropriate for the trial court to be given broad discretion in determining whether juror misconduct has occurred. In *State v. Shedd*, 274 N.C. 95, 161 S.E.2d 477 (1968), this Court elaborated on the justification for the trial court's broad discretion and stated:

The trial judge is clothed with power of discretion as to whether he should order a mistrial or set aside a verdict by reason of alleged misconduct of a juror or jurors "because of his learning and integrity, and of the superior knowledge which his presence at and participation in the trial gives him over any other forum. However great and responsible this power, the law intends that the Judge will exercise it to further the ends of justice, and though, doubtless it is occasionally abused, it would be difficult to fix upon a safer tribunal for the exercise of this discretionary power, which must be lodged somewhere."

*Id.* at 104, 161 S.E.2d at 483 (quoting *Moore v. Edmiston*, 70 N.C. 471, 481 (1874)).

Here, a thorough review of the record supports the trial court's decision to grant a mistrial based on juror misconduct. On three separate occasions on 5 October 1995, Judge Lamm sent the jurors out to deliberate and instructed them to resume deliberations. Twice after being sent out to deliberate, the jurors sent back a statement which revealed that they were not deliberating as Judge Lamm had instructed, but were discussing outside matters such as parole eligibility, a juror's outside investigation, evidence at the previous trial, and whether one juror believed in the death penalty. None of these matters had any bearing on their consideration of the aggravating and mitigating circumstances, which Judge Lamm had instructed and reinstructed the jurors to consider in connection with Issues Three and Four.

In fact, immediately after Judge Lamm reiterated his instructions that the jury was to consider the law as instructed by the court and the evidence heard in court "and nothing else," the jurors sent back a note which revealed they were considering irrelevant matters, contrary to the instructions Judge Lamm had just given. This note, which was written by juror number three, showed that at least one juror was discussing the fact that he or she had not heard the evidence in defendant's previous trial. The note also referenced a discussion of whether one juror believed in the death penalty. Thus, there is ample evidence that the jurors were disregarding the trial court's instructions concerning their duties and the law.

Additionally, Judge Lamm noted in his order the treatment which juror Lytle received in the jury room and "the emotional state that it put her in when she went home." While we recognize that jury deliberations require a certain degree of debate and the expression of personal beliefs, the trial court's findings of fact indicate that it believed that the conduct directed at juror Lytle exceeded the allowable limits. It is one thing to permit heated debate inside the jury room, but another to allow personal attacks and threats directed at a juror. Here, juror Lytle indicated that several jurors expressed their belief that she was not capable of continuing deliberations and that she should request the judge to replace her with an alternate. Further, according to juror Lytle, several jurors stated that they hoped she or "anybody in [her] family will be [defendant's] next victim." This conduct is further evidence that the jurors were ignoring Judge Lamm's instructions and continuing to discuss extraneous matters. Even defense counsel recognized this as juror misconduct by stating, "Well, there has been juror misconduct, Your Honor! There have been eleven people back there telling a juror she doesn't belong in that jury and she needed to get out." Once this conduct was brought to the attention of the trial court, there was sufficient evidence to support the trial court's discretionary decision to declare a mistrial.

Although the trial court failed to make any findings of fact with respect to the truth of the allegations concerning juror Lytle's conduct, the record reveals that juror number six told the other jurors that she had spoken with police officers and a judge concerning the definition of life imprisonment. Juror number six admitted on the record that she knew that discussing the case with outside parties was forbidden and that she deliberately told the other jurors that she committed this misconduct. Although she stated, on the record, that she had not actually conducted an outside investigation, the trial

court could not inform the other jurors that she had lied to them without diminishing her credibility with them. A misrepresentation of this nature by one juror to the other jurors also raises a question of juror misconduct.

Furthermore, the danger of potential prejudice to defendant existed in two different respects. First, assuming that the vote on Issue Four was eleven to one in favor of the death penalty, had the hold-out juror capitulated under the pressure, defendant would have received a death sentence. Second, if the eleven jurors voting for the death penalty had, in fact, been told that life meant twenty years in prison, it could have influenced their votes on the death penalty.

As this Court has previously stated, "[t]he determination of the existence and effect of jury misconduct is primarily for the trial court whose decision will be given great weight on appeal." *State v. Bonney*, 329 N.C. 61, 83, 405 S.E.2d 145, 158 (1991). A thorough review of the record reveals that, in the present case, the trial court properly exercised its discretion in ordering a mistrial. Although each instance of misconduct may not be, by itself, enough to warrant a mistrial, the cumulative effect of the misconduct rises to the level of "manifest necessity" for the declaration of a mistrial.

[2] Because we have concluded that the trial court in the present case properly declared a mistrial for a manifest necessity, defendant's right to be free of double jeopardy will not be violated by a further sentencing proceeding. "It has long been a fundamental principle of the common law of North Carolina that no person can be twice put in jeopardy of life or limb for the same offense." *Lachat*, 317 N.C. at 82, 343 S.E.2d at 876. However, this principle is not violated where a defendant's trial ends with a mistrial declared for a manifest necessity or to serve the ends of public justice. *Id.* When a mistrial has been declared properly, "in legal contemplation there has been no trial." *State v. Tyson*, 138 N.C. 627, 629, 50 S.E. 456, 456 (1905). This principle applies equally to sentencing proceedings. Accordingly, this assignment of error is overruled.

[3] Next, we will address defendant's contention that the trial court violated his constitutional rights by failing to make "findings of fact sufficient to identify the alleged misconduct of one or more jurors" which was the basis for the mistrial. Defendant argues that Judge Lamm's order "[m]akes it clear that the mistrial was based on something that occurred in the jury deliberation room, not on any impropriety occurring outside the deliberations themselves." He further

argues that the absence of explicit findings of fact makes it impossible for this Court to review this matter and to determine whether there was a factual basis for the trial court's conclusions that a juror or jurors had failed to abide by instructions.

N.C.G.S. § 15A-1064 provides that "[b]efore granting a mistrial, the judge must make finding [sic] of facts with respect to the grounds for the mistrial and insert the findings in the record of the case." N.C.G.S. § 15A-1064 (1983). The official commentary to the statute adds:

> This provision will be important when the rule against prior jeopardy prohibits retrial unless the mistrial is upon certain recognized grounds or unless the defendant requests or acquiesces in the mistrial. If the defendant requests or acquiesces in the mistrial, that finding alone should suffice.

In the present case, the findings of fact and conclusions of law, as set out above, sufficiently comply with N.C.G.S. § 15A-1064. While the trial court did not set out each instance of juror misconduct, the order provided a sufficient factual basis for appellate review. As this Court noted in *State v. Felton*, 330 N.C. 619, 412 S.E.2d 344 (1992):

> Even if the trial court's prefatory description of the motivating factors leading to its order of mistrial did not amount to a "finding of fact" as mandated by N.C.G.S. § 15A-1064, any such error is clearly harmless as the record here reveals ample factual support for the mistrial order.

*Id.* at 630, 412 S.E.2d at 351.

In fact, in *State v. Pakulski*, 319 N.C. 562, 356 S.E.2d 319 (1987), the trial court failed to make any contemporaneous findings in support of its mistrial declaration. However, this Court noted that the basis for the mistrial was "certainly apparent in the record." *Id.* at 570, 356 S.E.2d at 324. Similarly, here, the findings of fact, along with an examination of the record, provide ample support for the trial court's finding of "manifest necessity" warranting a mistrial.

[4] Finally, we address defendant's contention that the trial court erred in granting the mistrial without first exploring alternative remedies which could have allowed the sentencing proceeding to continue. Defendant argues that "[m]any options to mistrial were available and should have been given consideration before aborting the trial by granting the State's motion."

STATE v. SANDERS

[347 N.C. 587 (1998)]

This Court has recognized that the grant of a "[m]istrial is a drastic remedy, warranted only for such serious improprieties as would make it impossible to attain a fair and impartial verdict." *State v. Stocks*, 319 N.C. 437, 441, 355 S.E.2d 492, 494 (1987). In the present case, the trial court properly explored other options prior to declaring a mistrial. For example, regarding the incident with juror number six, the trial court did not immediately declare a mistrial. Instead, the trial court addressed the questions which had arisen regarding life imprisonment. The trial court instructed the jury that life imprisonment means "imprisonment in the state's prison for life." It further admonished the jurors to eliminate from their minds the question of parole eligibility and to put aside any "inaccurate information."

Thus, the trial court gave the jury an opportunity to resume proper deliberations and continue the sentencing proceeding to conclusion. However, after the jury deliberated for only twenty additional minutes, it became apparent to the trial court that the jury had disregarded its instructions and was once again discussing extraneous matters and failing to focus on the issues at hand. At that point, the trial court, in its discretion, determined that a mistrial was the appropriate remedy. After previously exploring a less drastic remedy, by giving the jury additional curative instructions, the trial court determined that a mistrial was "manifestly necessary." We agree with the trial court's decision and do not believe that the trial court erred in resorting to this drastic remedy. Accordingly, this assignment of error is overruled.

AFFIRMED.

Justice FRYE dissenting.

I am troubled by the difficulties the State has encountered in seeking to secure the death penalty for this defendant for this terrible crime. The General Assembly has provided that when a jury cannot, within a reasonable time, unanimously agree to a sentencing recommendation, the judge shall impose a sentence of life imprisonment. N.C.G.S. § 15A-2000(b) (1997). It seems abundantly clear that, at the time the court declared a mistrial, the jury could not unanimously agree to a sentencing recommendation. The appropriate action was for the judge to either impose a sentence of life imprisonment or encourage the jurors to continue deliberating to see if they could unanimously agree to a sentencing recommendation. "[A] trial court in a capital case has no authority to discharge the jury without the

defendant's consent and hold the defendant for a second trial, absent a showing of 'manifest necessity' for a mistrial." *State v Lachat*, 317 N.C. 73, 82-83, 343 S.E.2d 872, 877 (1986). In this capital sentencing proceeding, defendant objected to a mistrial. No manifest necessity justified discharging this third capital sentencing jury and convening yet another jury to recommend life or death. Because the jury was unable to reach a unanimous agreement as to the sentencing recommendation, our statute requires the imposition of a sentence of life imprisonment. N.C.G.S. § 15A-2000(b).

Justice WEBB joins in this dissenting opinion.