PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

STANLEY SANDERS,
            *Petitioner-Appellant,*

v.

MICHAEL F. EASLEY, Attorney
General of the State of North
Carolina; R. C. LEE, Warden,
Central Prison, Raleigh, North
Carolina,

            *Respondents-Appellees.*

No. 00-2

Appeal from the United States District Court
for the Western District of North Carolina, at Asheville.
Richard L. Voorhees, District Judge.
(CA-98-184-1-V)

Argued: September 26, 2000

Decided: October 31, 2000

Before WILKINS and LUTTIG, Circuit Judges, and
HAMILTON, Senior Circuit Judge.

Dismissed by published opinion. Judge Wilkins wrote the opinion, in
which Judge Luttig and Senior Judge Hamilton joined.

## COUNSEL

**ARGUED:** James Richard Glover, GLOVER & PETERSEN, P.A.,
Chapel Hill, North Carolina, for Appellant. Ellen Bradshaw Scouten,

Special Deputy Attorney General, NORTH CAROLINA DEPART-
MENT OF JUSTICE, Raleigh, North Carolina, for Appellees. **ON
BRIEF:** Anthony Lynch, LYNCH & TAYLOR, Marion, North Caro-
lina, for Appellant. Michael F. Easley, Attorney General of North
Carolina, NORTH CAROLINA DEPARTMENT OF JUSTICE,
Raleigh, North Carolina, for Appellees.

---

## OPINION

WILKINS, Circuit Judge:

Stanley Sanders seeks to appeal an order of the district court deny-
ing his petition for a writ of habeas corpus.[1] *See* 28 U.S.C.A. § 2254
(West 1994 & Supp. 2000). Sanders wishes to avoid a fourth capital
sentencing proceeding, asserting that such a hearing is barred by the
Double Jeopardy Clause. Because Sanders has failed to make a sub-
stantial showing of the denial of a constitutional right, *see* 28
U.S.C.A. § 2253(c)(2) (West Supp. 2000), we deny a certificate of
appealability and dismiss the appeal.

### I.

In 1982, Sanders was convicted of the rape and murder of Jacque-
line Lee and was sentenced to death. His convictions and sentence
were vacated on appeal, however, because of problems with the trial
transcript. *See State v. Sanders (Sanders I)*, 321 S.E.2d 836, 837
(N.C. 1984) (per curiam). Sanders was again convicted and sentenced
to death in 1985. The North Carolina Supreme Court affirmed his
convictions on appeal, but vacated the death sentence on the basis that
the penalty-phase jury instructions violated *McCoy v. North Carolina*,
494 U.S. 433 (1990). *See State v. Sanders (Sanders II)*, 395 S.E.2d
412, 429 (N.C. 1990).

---

[1]Sanders named Michael F. Easley, Attorney General of North Caro-
lina, and R. C. Lee, Warden of Central Prison where Sanders is incarcer-
ated, as Respondents. For ease of reference, we refer to Respondents as
"the State" throughout this opinion.

Sanders' third capital sentencing hearing began on September 11, 1995 and ended in a mistrial on October 5. Before the jury retired to consider its verdict, it was instructed that it would be required to consider four issues: (1) whether the State had proven one or more aggravating circumstances; (2) whether Sanders had established the existence of any mitigating circumstances; (3) whether the aggravating circumstance or circumstances found by the jury outweighed any mitigating circumstances found by any of the jurors; and (4) whether the aggravating circumstance or circumstances were of sufficient weight to justify imposition of the death penalty. The jury began deliberating at 10:45 a.m. on October 4, and broke for lunch from 12:25 to 2:10. At 4:00, the jury submitted the following question to the trial court:

> How do we as a jury, when one or more of us have questions regarding facts of the case (feel we have not been given enough information) deal with finding the facts or coming to an undecisive [sic] conclusion.

J.A. 183. The trial court learned from the foreman that the problem related to issue three, and accordingly reinstructed the jury on issues three and four. The jury resumed deliberations at 4:20.

At 5:05, the trial judge brought the jury to the courtroom to excuse them for the day. In taking custody of the verdict sheet and the jurors' notes, the court noted that there was a folded piece of paper on the top of the materials. The foreman indicated that the paper contained another question for the court but that the jury was not finished formulating it. The next morning the trial court, having read the uncompleted question, asked the foreman "how long . . . have you been deliberating on the issue that you're currently deliberating on?" J.A. 150. The foreman stated that the jury had been working on the current issue since the previous afternoon and that it had taken three votes, the last of which differed from the first two. The court then directed the jury to resume deliberations, which it did at 9:49.

At 10:20, the jury submitted the following note:

> We have a vote of 11-1
> Hung Jury on the final Issue

J.A. 184. In response to questioning from the court, the foreman indicated that the jury had begun deliberating on issue four that morning.[2] The trial court sent the jury back to the jury room with instructions to continue to deliberate. At 10:55, the jury submitted the following note to the court:

> We can not [sic] come to a unanimously [sic] decision on Issue Four.

> We had a [sic] error at one point and went ahead & signed it but we re-read Recommendation as to punishment.

> We need to know if life means life in prison.

> We got one juror who done investigation on her own and talked to a judge and Police officers.

J.A. 185. The foreman informed the court that the "one juror" was juror #6, Renita Lytle, and that she had told the jury that she had talked to a judge and police officers who told her that Sanders would serve at least 20 years if sentenced to life imprisonment.

Based on this information, the trial court stated that "I don't think I've got any choice at this stage but to declare a mistrial because of juror misconduct, and I think I've got probable cause to do that." J.A. 160. Defense counsel urged the court not to declare a mistrial. The State also indicated its reluctance to have a mistrial, and suggested questioning Lytle in hopes of avoiding one. Lytle offered the following explanation:

> JUROR LYTLE:   . . . Your honor, I lied about telling the jury that I talked to anyone about the situation for being the only one in there and having all the people, the jurys [sic], hollering at me, fussing at me, hoping that things—bad things to me. When I went home yesterday, I cried all the way home cause I . . . get along with everybody and I hate

---

[2]Evidently, the note that the jury did not submit to the trial court also indicated that the jury was divided 11-1, but on the third issue.

for anybody to be mad at me. And when I got home yesterday, I was trying to figure out a way . . . of getting them people to let me have my own opinion, which they didn't. I mean they would not let me be satisfied with my opinion about things. They would not listen to me. Everybody was like against me and . . . I could not take the pressure of them hollering at me so I went home. I did call my nephew but I did not say anything about the case. I just asked him about what kind of gun he carried . . . . I did not ask him about the case and the only reason I told them is because the truth is I did call a . . . police officer; thats the truth. But I did not say anything about the case.

And then I told a lie about the judge because . . . they was making me think that I was dumb and that I didn't have a right to my opinion. . . . I mean yesterday they were like, "You need to get out of here!" I mean, "You don't need to be in here! You need to go tell the judge that I don't belong in here and get one of them alternates to come in and take your place." I mean it was really pressuring me into doing things that I really didn't believe in, and I was feeling hurt and I was feeling sad because they didn't like me for the reason, for my suggestion, . . . and I couldn't take the pressure and so I figured if I just tell them that, . . . then they will just back off and leave me alone . . . .

. . . .

THE COURT:   . . . Well, let me ask you this, Mrs. Lytle, what is your understanding about what life in prison means?

JUROR LYTLE:  I don't know, my understanding of life in prison is life in prison. I mean you go to jail and you remain for life; thats my understanding. . . . [B]ut they're like no, it's not. I mean, told me that if I decide that he get life imprisonment, then he'll get out in a couple of months. And then . . . they told me plainly, "And I hope that you or anybody in your family will be his next victim." And with all that was said, I just could not take it. I mean it's too hard

and they hoping bad things to my family, I mean that's not right.

J.A. 164-67.

Following this colloquy, the trial court stated that it did not have probable cause to cite Lytle for juror misconduct. The court instructed the jury, in accordance with North Carolina law, that parole eligibility was irrelevant to the sentencing determination and that the jury should proceed as if life meant "[i]mprisonment in the state's prison for life." J.A. 174 (internal quotation marks omitted). The court also instructed the jury to attempt to reach a verdict without individual jurors surrendering their conscientious convictions. The jury resumed deliberations at 12:25.

At 12:45, another note was submitted to the court:

(1)   Is a statement from Juror #6 [Lytle] that because we were not at the earlier trials for murder and did not know all the facts, that she could not vote for the death sentence and didnt know how the rest of us could, Is that reason acceptable to the court.

(2)   Juror 6 made several statements that basically said she did not believe in the death penalty; however, when pressed on the issue said she did believe in it.

   I'm sorry if I'm making trouble for the court, I simply felt I needed to ask these questions. If you don't wish to answer, that is, of course, fine with me.

      Thank you,
      Juror #3

J.A. 186. After reviewing the note, defense counsel requested that the court determine whether the jury was still deadlocked, and if so, impose a life sentence. In making this request, counsel observed that the jury had "degenerated into something that is much less than jury deliberations." J.A. 177. The State moved for a mistrial, and the trial

court granted the motion. The court subsequently issued the following written order:

> During jury deliberations in the above entitled matter, the jury, through the foreperson, handed out via the courtroom bailiff to the Court a number of written questions and statements, all of which the Court attempted to answer after conferring with the attorneys on the record with the defendant present. All of these questions and statements of the jury, conferences with counsel and responses by the Court to the jury appear of record. Likewise, the conferences with counsel regarding how to proceed after it was reported in writing to the Court by the jury foreperson that a juror, during an overnight recess of jury deliberations, said that she had talked with a judge and police officer or officers about certain aspects of the matter appear of record, as does the Court's rulings on various motions, it's [sic] questioning individually the foreperson and juror number six, and their responses to the Court's questions.
>
> Therefore, the Court makes no findings with regard to matters that appear in the official court file or transcript, which speak for themselves. Nor does the Court make any finding with regard to the truth or falsity of the substance of what was reported to the Court individually by the foreperson or by juror number six regarding her conduct during the overnight recess in deliberations.
>
> However, after considering all matters, both written and oral, transmitted to the Court by the foreperson or by an individual juror, the Courts instructions to the jury regarding the law they were to apply and repeated instructions by the Court as to their conduct both while in or out of court (all of which appear of record), and after considering arguments of counsel, the Court makes the following Findings of Fact:
>
> 1. From observation of juror number six during her being individually questioned by the Court, the statements she made as to the treatment she had received by some other members of the jury during its deliberations the previous

afternoon and the character of the subsequent written communication that was delivered to the Court by an individual juror, the statements juror number six made concerning the treatment she received are credible and true.

2. One or more of the jurors are not following the law as instructed by the Court, nor are they following the subsequent instructions of the Court as to their duties and conduct of jury deliberations.

3. The failure of one or more jurors to abide by the Court's instructions began to occur before the jury had been deliberating for a reasonable length of time.

Based upon all matters of record and the above findings of fact, the Court makes the following Conclusion of Law:

1. That one or more jurors have engaged in juror misconduct, which misconduct has occurred prior to the expiration of a reasonable length of time within the meaning and intent of [N.C. Gen. Stat. § 15A-2000(b) (1999)].[3]

2. That considering all of the circumstances, the only appropriate course is to discharge the jury and terminate this sentencing hearing.

It is therefore ORDERED, that the motion by the State for a mistrial is hereby ALLOWED.

J.A. 187-88.

The State scheduled another sentencing hearing—Sanders' fourth —in March 1996. Prior to the commencement of the hearing, Sanders moved to cancel it on double jeopardy grounds. When this motion was denied, he sought review of the declaration of mistrial and denial

---

[3]N.C. Gen. Stat. § 15A-2000(b) provides in pertinent part that "[i]f the jury cannot, within a reasonable time, unanimously agree to its sentence recommendation, the judge shall impose a sentence of life imprisonment."

of the motion in the North Carolina Supreme Court. That court affirmed, reasoning that the declaration of a mistrial was supported by manifest necessity. *See State v. Sanders (Sanders III)*, 496 S.E.2d 568, 575-77 (N.C. 1998). Specifically, the court concluded that the jury had ignored the trial judge's instructions and discussed "outside matters such as parole eligibility, a juror's outside investigation, evidence at the previous trial, and whether one juror believed in the death penalty." *Id.* at 575. The court also determined that the trial court properly concluded that the coercion of Lytle "exceeded the allowable limits" and was itself sufficient justification for a mistrial. *Id.*

Sanders thereafter filed this habeas petition. The case was referred to a magistrate judge, who recommended denying relief. After considering and rejecting Sanders' objections, the district court adopted the magistrate judge's recommendation. Sanders now appeals.

II.

A.

The Double Jeopardy Clause of the Fifth Amendment, made applicable to the states through the Fourteenth Amendment, provides that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const. amend. V; *see Benton v. Maryland*, 395 U.S. 784, 794 (1969). Among other things, the Double Jeopardy Clause protects a criminal defendant from facing "repeated prosecutions for the same offense," *Oregon v. Kennedy*, 456 U.S. 667, 671 (1982); accordingly, the state is generally allowed only one opportunity to compel a defendant to stand trial, *see Arizona v. Washington*, 434 U.S. 497, 505 (1978). This protection encompasses a right to have a particular tribunal decide guilt or innocence once jeopardy has attached. *See id.* at 503. But, this right is not absolute. There are circumstances under which retrial is permitted after a criminal proceeding has ended in mistrial. For example, if a defendant requests or consents to a mistrial, the Double Jeopardy Clause will not bar retrial unless the prosecutor has engaged in conduct intended to provoke the mistrial request. *See Kennedy*, 456 U.S. at 675-76. If the defendant opposes the declaration of a mistrial, however, retrial is prohibited unless there was a manifest necessity for the mistrial or the failure to

declare a mistrial would have defeated the ends of justice. *See Wade v. Hunter*, 336 U.S. 684, 690 (1949). This proposition of law was first recognized in *United States v. Perez*, 22 U.S. (9 Wheat.) 579, 580 (1824), in which Justice Story wrote:

> We think, that in all cases of this nature, the law has invested Courts of justice with the authority to discharge a jury from giving any verdict, whenever, in their opinion, taking all the circumstances into consideration, there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated. They are to exercise a sound discretion on the subject; and it is impossible to define all the circumstances, which would render it proper to interfere. To be sure, the power ought to be used with the greatest caution, under urgent circumstances, and for very plain and obvious causes; and, in capital cases especially, Courts should be extremely careful how they interfere with any of the chances of life, in favour of the prisoner. But, after all, they have the right to order the discharge; and the security which the public have for the faithful, sound, and conscientious exercise of this discretion, rests, in this, as in other cases, upon the responsibility of the Judges, under their oaths of office.

Whether the declaration of a mistrial is manifestly necessary turns on the facts before the trial court. *See Illinois v. Somerville*, 410 U.S. 458, 464 (1973); *see also Arizona v. Washington*, 434 U.S. at 506 (explaining that the "manifest necessity" standard cannot "be applied mechanically or without attention to the particular problem confronting the trial judge"). While manifest necessity for a mistrial does not require that a mistrial be "necessary" in the strictest sense of the word, it does require a high degree of necessity. *See Arizona v. Washington*, 434 U.S. at 506. Perhaps the clearest example of a situation in which manifest necessity exists for a mistrial is when a jury is unable to reach a verdict. *See id.* at 509. At the other extreme are situations in which the prosecution seeks a mistrial in order to have additional time to marshal evidence to strengthen the case against the defendant. *See id.* at 508. Between these two extremes exists a spectrum of trial errors and other difficulties, some creating manifest necessity for a mistrial and others falling short of justifying a mistrial.

In all cases, the determination of a trial court that a mistrial is manifestly necessary is entitled to great deference. *See id.* at 510. Nevertheless, "reviewing courts have an obligation to satisfy themselves that, in the words of Mr. Justice Story, the trial judge exercised 'sound discretion' in declaring a mistrial." *Id.* at 514. If the grant of a mistrial by the trial judge amounts to an irrational or irresponsible act, he must be found to have abused his discretion in finding that manifest necessity for the mistrial existed, for a trial judge "'must always temper the decision whether or not to abort the trial by considering the importance to the defendant of being able, once and for all, to conclude his confrontation with society through the verdict of a tribunal he might believe to be favorably disposed to his fate.'" *Id.* (quoting *United States v. Jorn*, 400 U.S. 470, 486 (1971) (Harlan, J.) (plurality opinion)).

B.

Because Sanders filed his habeas petition after the April 24, 1996 enactment of the Antiterrorism and Effective Death Penalty Act (AEDPA) of 1996, Pub. L. No. 104-132, 110 Stat. 1214, the amendments to 28 U.S.C.A. § 2254 effected by § 104 of the AEDPA govern our resolution of this appeal. Accordingly, the question before us is not simply whether manifest necessity or the ends of public justice supported the declaration of a mistrial in Sanders' case. Rather, we must determine whether the decision of the North Carolina Supreme Court in *Sanders III* "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C.A. § 2254(d)(1). We may not grant habeas relief unless, at a minimum, this standard is satisfied. As the Supreme Court recently explained in *Williams v. Taylor*, 120 S. Ct. 1495, 1523 (2000), a state court decision is "contrary to" clearly established federal law if the state court has "arrive[d] at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." A state court decision constitutes an unreasonable application of federal law if it "identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.*

It certainly cannot be said that the decision of the North Carolina Supreme Court in *Sanders III* was contrary to clearly established Supreme Court precedent. The state court correctly identified "manifest necessity" as the governing standard and articulated specific considerations similar to those recognized by the Supreme Court. *See Sanders III*, 496 S.E.2d at 573-74; *see also id.* at 574 (quoting statement of Justice Story from *United States v. Perez*).

We also conclude that the decision in *Sanders III* did not result from an unreasonable application of clearly established Supreme Court precedent. Again, we note that the determination we are required to make under the AEDPA is a very limited one. It is not whether there was manifest necessity for a mistrial, but rather whether the North Carolina Supreme Court ruled unreasonably in concluding that manifest necessity existed. *See Williams*, 120 S. Ct. at 1522 ("Under § 2254(d)(1)'s 'unreasonable application' clause, . . . a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable.").

By the time the trial court declared a mistrial, it had been presented with numerous instances indicating that the jury deliberations had devolved into something much less than a reasoned, good faith attempt to reach a verdict. The first concrete indication that the deliberations were troubled was the foreman's note regarding the outside investigation purportedly conducted by Lytle concerning the irrelevant issue of parole eligibility.[4] In attempting to resolve that issue, the trial court learned that Lytle had been subjected to harassment by her fellow jurors, to the extent she felt it necessary either to consult with third parties regarding the case or to fabricate such a consultation in hopes that the other jurors would find her views more palatable. Although the trial court did not find it necessary to declare a mistrial at that juncture, instead attempting to cure the problem through fur-

---

[4]The prior two notes—the first indicating that one or more jurors felt that they lacked sufficient information and the second indicating that the jury was "hung" on issue four—provide no clear indication that the jury was considering extraneous matters or was failing to deliberate in good faith.

ther jury instructions, the note from Juror #3 disclosed that the problems had not ceased, but rather had simply taken a new form. At a minimum, the note from Juror #3 revealed a continuing exasperation with Lytle, strongly indicating the possibility that the harassment was continuing. The note could also be read to indicate continued consideration of extraneous matters, namely, what occurred at the previous trial.[5] While none of these incidents may have justified a mistrial if presented in isolation, we cannot say that the North Carolina Supreme Court acted unreasonably in concluding that, in light of all the incidents, the jury deliberations had become such a debacle that the state interest in a just verdict could only be protected by the declaration of a mistrial.

Sanders raises several arguments, none of which persuades us of the unreasonableness of the state court decision. First, Sanders contends that "strict scrutiny" of the mistrial order is required because the declaration of a mistrial favored the State, in that the mistrial afforded the State another opportunity to seek the death penalty against Sanders. Brief of Petitioner-Appellant at 28. Of course, double jeopardy principles will bar retrial after the prosecution has engaged in bad faith actions intended to provoke a mistrial request by the defendant. *See United States v. Dinitz*, 424 U.S. 600, 611 (1976); *see also Kennedy*, 456 U.S. at 675-76 (explaining that prosecutorial overreaching "does not bar retrial absent intent on the part of the prosecutor to subvert the protections afforded by the Double Jeopardy Clause"). Here, however, even viewing the facts in the light most favorable to Sanders, the most that can be said is that the State was pleased to have the opportunity to retry Sanders. There is not even a scintilla of evidence to suggest that the prosecution had any part in creating the circumstances that led the trial court to declare a mistrial.

Sanders next maintains that the potential grounds for mistrial identified by the State on appeal—the discussion of parole eligibility, outside investigation, the previous trial, and whether Lytle believed in the death penalty (dubbed by Sanders as "the four irrelevancies")— did not support a mistrial. Essentially, Sanders maintains that the trial court could not have found juror misconduct based upon the discus-

---

[5]The trial court had explicitly instructed the jury that "[a]ll of the evidence relevant to your recommendation has been presented." J.A. 98.

sion of the irrelevancies because, after each one was brought to light, the court instructed the jury not to consider it, and the record does not demonstrate that the jury continued to consider improper matters after being instructed by the judge not to do so.[6]

This argument demonstrates a failure to appreciate the significance of the fact that the events that preceded the declaration of mistrial did not occur in isolation, but were rather part of a pattern. As noted previously, Sanders may be correct that each incident, by itself, may not have been enough to create manifest necessity for a mistrial. However, the trial court was not presented with only one incident, but rather with a series of occurrences. It simply was not unreasonable for the North Carolina Supreme Court to conclude that these instances, taken together, created manifest necessity for a mistrial on the basis that the jury not only had failed to engage in good faith, reasoned deliberations regarding the issues before them prior to the giving of curative instructions, but also that the jury was continuing to stray from its task.

Finally, Sanders claims that the trial court acted precipitously in declaring a mistrial. This assertion is flatly contradicted by the record, which demonstrates that the court was reluctant to declare a mistrial and engaged in several efforts to get the jury back on track. Only when it was clear that these efforts had failed did the court declare a mistrial.

### III.

For the reasons set forth above, we conclude that the decision of the North Carolina Supreme Court in *Sanders III* neither was contrary to, nor rested on an unreasonable application of, clearly established federal law as determined by the Supreme Court. Accordingly, we deny Sanders' request for a certificate of appealability and dismiss the appeal.

*DISMISSED*

---

[6]Sanders makes this same argument with respect to the treatment of Lytle, essentially asserting that because the jurors were never instructed not to mistreat and harass each other, it was not misconduct for them to do so.