STATE OF NORTH CAROLINA v. LOUISE EDITH LACHAT

No. 243A85

(Filed 3 June 1986)

1. **Constitutional Law § 34; Criminal Law § 26.8— murder prosecution—prior mistrial—no findings on necessity—double jeopardy violation**

   The trial court erred by denying defendant's motion to dismiss a murder charge on the ground of former jeopardy where the court in defendant's first trial declared a mistrial when no necessity existed; the court stated more than once that it did not believe the jury could ever reach a verdict and that the case would be considered later by another jury; the jurors made clear that they would like a recess but wished to continue deliberations; the court struck its withdrawal of a juror; the jury returned the next day and resumed deliberations; a mistrial was declared when a verdict could not be reached; the trial court did not make findings or conclusions concerning any necessity for its actions; and an attempt four months later to make the required findings and conclusions was not successful. N.C.G.S. § 15A-1064.

2. **Criminal Law § 128; Constitutional Law § 34— murder—double jeopardy—no objection to prior mistrial—not required in capital case**

   Defendant's failure to object to a mistrial during her first murder trial did not prevent her from receiving relief on double jeopardy grounds; the rule of State v. Odom, 316 N.C. 306, should not be applied in capital cases. N.C.G.S. § 15A-1064.

APPEAL by the defendant from judgment entered on 14 December 1984 by *Wood, J.*, in Superior Court, FORSYTH County.

The defendant was tried on an indictment, proper in form, charging her with murder in the first degree. Upon her plea of not guilty, the jury returned a verdict of guilty of murder in the first degree. The State then stipulated that there were no aggravating factors present. The trial court concurred in that conclusion and entered judgment sentencing the defendant to imprisonment for the term of her natural life. The defendant appealed to the Supreme Court as a matter of right under N.C.G.S. § 7A-27(a). Heard in the Supreme Court 19 November 1985.

*Lacy H. Thornburg, Attorney General, by David Roy Black-well, Assistant Attorney General, for the State.*

*Cofer and Mitchell, by William L. Cofer, for the defendant appellant.*

MITCHELL, Justice.

This appeal presents *inter alia* the issue of whether the prohibition against double jeopardy forbade the second trial of the defendant for murder, since her previous trial on the same charge had been terminated by a mistrial without findings of fact by the trial court showing that a mistrial was necessary. We answer in the affirmative and hold that the trial court erred by denying the defendant's motion to dismiss the murder charge against her on the ground of former jeopardy. As a result, the judgment entered against the defendant in this case must be vacated and the defendant discharged from custody.

The defendant, Louise Edith Lachat, was indicted on 5 March 1984 for the murder in the first degree of her thirteen-year-old daughter Michelle. She was first tried on this charge before the Superior Court, Forsyth County, in August of 1984. That trial ended during the guilt determination phase when the court declared a mistrial *ex mero motu* on 11 August 1984.

On 6 December 1984, the defendant filed a written motion to dismiss the charge against her. In her motion she stated that the declaration of mistrial which terminated her first trial was made without consulting her attorney or affording him an opportunity to object and without making findings of fact with respect to the grounds for the mistrial. The defendant therefore contended that a retrial would unconstitutionally "subject her to double jeopardy for the same offense." On 10 December 1984, the trial court heard arguments of counsel, took evidence, made findings of fact and conclusions of law and denied the defendant's motion to dismiss. The trial court then commenced the second trial of the defendant —the trial from which this appeal was taken.

A complete recitation of the evidence presented at the trial from which this appeal was taken is unnecessary to a consideration of the issues we find dispositive. In summary, some of the evidence tended to show the following:

Michelle Lachat appeared in September 1982, to be the normal and healthy thirteen-year-old daughter of Remy and Louise Lachat. Michelle and her mother had a very warm and loving relationship. They had visited relatives in Switzerland in August and returned to prepare for the coming school year.

Remy Lachat worked for the LaRose Company, a sportswear manufacturer. The Lachats lived well. In September 1982, however, Louise Lachat became increasingly suspicious that her husband's sportswear manufacturing business was failing. He assured her throughout the summer that the business was fine. Finally, on Sunday, 12 September 1982, the defendant Louise Lachat contacted one of the partners in the LaRose Company. He informed her that the business stood on the verge of bankruptcy and no longer employed her husband. The defendant reacted like a concerned wife who had just learned of an investment failure. Despite the failure, the Lachats appeared financially secure for the immediate future.

At approximately 6:30 p.m. on Monday, 13 September 1982, Remy Lachat began screaming and banging on the door of his neighbor, John Storch's house. Remy was yelling that his daughter and wife were dead. Storch and Remy Lachat ran to the Lachat home. Once there, Storch observed Michelle apparently dead in a bathtub of cold water. The defendant Louise Lachat appeared to be dead lying on her bed in the master bedroom of the home. Remy Lachat carefully removed his daughter's body and placed it on the bed in her room.

Dr. Lou Stringer, Forsyth County Medical Examiner, arrived at the Lachat home shortly after 7:00 p.m. He found the defendant unconscious with very poor breathing and pulse. He was able to stabilize the defendant's condition, and an ambulance transported her to Baptist Hospital. Dr. Stringer found Michelle Lachat on her bed and determined that she was dead.

After treating the defendant Louise Lachat and examining the body of Michelle, Dr. Stringer performed his function as a medical examiner. An autopsy indicated that Michelle had died of drowning, but only a minimal amount of water was found in her lungs. A high level of amitriptyline, a tricyclic antidepressant drug, indicated that Michelle had been drugged before drowning.

Sally Virginia West, a registered nurse working in the intensive care unit of Baptist Hospital, testified that after regaining consciousness the defendant made certain statements. The defendant specifically stated that she had killed her daughter. Nurse Linda Johnson testified that the defendant made a statement to her in which the defendant admitted that she had gotten Michelle up for breakfast, placed medicine in her food and later held her underwater in the bathtub until the defendant was sure that she was dead. The defendant also stated that she had killed Michelle because of financial problems which she did not want her daughter to have to live through. The defendant stated that: "She was very sorry that she hadn't died too."

Dr. Barry Cole, a qualified psychiatrist, met the defendant Louise Lachat in the intensive care unit of Baptist Hospital the day after her daughter's death. He interviewed the defendant at that time, and she told him of her actions causing the death of her daughter. Dr. Cole also spoke with members of the hospital staff concerning information they had received from the defendant's family and friends and examined the defendant's hospital medical records. Dr. Cole formed the opinion that the defendant did not know the difference between right and wrong at the time she killed her daughter.

Dr. Selwyn Rose examined the defendant on 15 September 1982. He examined her again on two occasions within the following week. He had the defendant transferred to another hospital and later to the Mandala Center. During the following six or seven weeks, he thoroughly examined the defendant and had several tests performed on her. He too formed the opinion that the defendant did not know the difference between right and wrong at the time she killed her daughter. Although he felt that the defendant understood the nature of her act in killing her daughter, he was of the opinion that she did not understand the quality of her act.

The jury returned a verdict of guilty of murder in the first degree. The trial court then concluded that there were no aggravating factors and entered judgment sentencing the defendant to imprisonment for life.

[1] The defendant assigns error to the trial court's denial of her motion to dismiss the charge against her prior to her second trial

for the murder of her daughter. She contends that by denying her motion, the trial court erroneously placed her in jeopardy a second time for the same offense in violation of the Constitution of the United States, the Constitution of North Carolina and the statutes and common law of North Carolina. We neither consider nor decide the questions the defendant contends arise under the Constitution of the United States. Instead, we conclude that she is entitled on adequate and independent grounds of North Carolina law to have the judgment against her vacated and the charge of first degree murder dismissed.

The defendant specifically contends that the trial court committed reversible error by failing to make findings of fact on the question of the necessity for a mistrial before declaring a mistrial during her first trial for the murder of her daughter. We find this contention to have merit.

After the admission of all of the evidence at the defendant's first trial, the jury began deliberations at 4:24 p.m. on a Thursday. Court was recessed for the evening at 5:10 p.m. The jury returned on Friday morning at 9:30 a.m. and deliberated until 8:06 p.m. At that time the jury returned to the courtroom and reported to the trial court as follows:

> FOREMAN OF THE JURY: Your Honor, the jury feels that we are not able to reach a unanimous decision. We have reached an impasse.
>
> COURT: Let me ask you a question. Now, I don't want to know how you're divided up, I want to know the numerical differences, such as ten and two or eight and four or how you are divided that way.
>
> FOREMAN OF THE JURY: It's either nine and three or eight and four or seven and three.
>
> COURT: Well, I'm going to ask you to go back in there and deliberate further.
>
> . . . .
>
> FOREMAN OF THE JURY: We'll try.

(JURY DELIBERATIONS CONTINUED AT 8:09 P.M.)

State v. Lachat

(The following took place about 9:45 p.m.)

COURT: You all want to approach the bench here?

(COUNSEL APPROACHED THE BENCH.)

COURT: Bring the jury in.

(JURY RETURNED TO THE COURTROOM AT 9:46 P.M.)

COURT: Mr. Foreman, are you making any progress?

FOREMAN OF THE JURY: No, sir.

COURT: You think you—

FOREMAN OF THE JURY: We have gotten to the point that we would like to ask for a recess.

COURT: Until tomorrow?

FOREMAN OF THE JURY: Until some time. We feel that some of the jurors are pretty fatigued and we're not making that much progress.

COURT: Well, let me ask you this: Do you think if you came back tomorrow you could make any progress?

FOREMAN OF THE JURY: I don't know how much.

COURT: Well, when I say progress, do you think you could reach a verdict in this case if you came back.

FOREMAN OF THE JURY: The last period of time has been very difficult moving forward.

COURT: Well, I'm going—what I'm going to do at this time, I'm going to withdraw a juror and declare a mistrial; so we'll withdraw Juror Number 12 and declare a mistrial.

I think that you deliberated long enough; if you could reach a verdict, you would have done it by now.

So I want to thank you for your service, your patience here and for your hard work on this case. I'm sorry that you couldn't reach a verdict.

And, of course, this means this case will have to be tried again by some other jury. I can say that to you now.

But it's my feeling if you couldn't reach a verdict all day today until nine and an hour yesterday that I don't believe you would have ever done it by staying out — by bringing you back tomorrow morning or staying late — letting you stay out further tonight.

I don't want to let you stay out further tonight. I don't want to punish jurors.

FOREMAN OF THE JURY: Yes, Your Honor, we tried very, very hard. We made a lot of progress. We fought and reiterated and no one was bashful about talking. No one was bashful about putting their input in.

We have some divergent opinions and we have individuals. All of us are very strong willed about their opinions, and there's always a possibility that given more time that people do change their minds, and I don't—

It has been very difficult for all of us to say that we cannot reach a verdict, but I think we — and I want the record to show that we did try very hard.

COURT: No question about that. Let me tell you, you're not the first jury that's been in this situation.

FOREMAN OF THE JURY: Again, we are willing to keep trying, and it's a situation that — that has not made a lot of progress and it just keeps —

The issues are not that profound, but it's a question that we're — that we have just not been able to accomplish getting over the barrier. And that's kind of the way I sum it up.

COURT: I think that then I made a mistake withdrawing a juror.

JUROR NUMBER SEVEN: I do.

FOREMAN OF THE JURY: I can't say that. I don't know that. I don't have that much experience, you know. Certainly you have much more than I do.

I don't want the jury to think I made a decision for them on the thing. And I have not done that, but we have reached a point that we have been for several hours, and it has been a very rapid discussion about the issues and the points.

And I just wanted to make that statement.

COURT: Well, you think if you came back here tomorrow and tried again that you could reach a verdict?

JUROR NUMBER SEVEN: There's a possibility.

JUROR NUMBER FIVE: Anything's possible. Everyone's tired.

JUROR NUMBER SEVEN: We didn't say that. We did not agree to say that. Everybody wants to try. We haven't given up.

COURT: Any objections to my declaring a mistrial?

MR. COFER: I've never been faced with this situation before.

. . . .

COURT: How's the defendant feel?

MR. COFER: Well, obviously, Your Honor, if I thought the verdict was going my way I'd want them to stay here all night, but—

COURT: I'm not talking about staying here all night. I'm going to comply with the wishes of the jury under the circumstances.

MR. COFER: Well, if the jurors can deliberate in good faith. I agree they've been here too long.

COURT: Yes, I thought they'd been here too long, and I came—made my mind up when you came back and—that you'd been here too long.

Well, I'll strike the withdrawal of the juror, reinstate Juror No. Twelve, and we'll continue with this tomorrow morning.

And since the general opinion of the members of the jury is that they can possibly make some progress tomorrow.

The court then released the jury for the evening with instructions to return the following morning. All of the jurors were present at the appointed time the next day, when the following transpired:

COURT: Now, ladies and gentlemen, again I send you back to the jury room to deliberate. Again I tell you to make up your—to deliberate conscientiously, make up your verdict, and let your verdict speak the truth.

(JURY DELIBERATIONS CONTINUED AT 9:41 A.M.)

(JURY SENT A QUESTION TO THE JUDGE.)

(JURY RETURNED TO THE COURTROOM AT 10:46 A.M.)

COURT: You have a question.

FOREMAN OF THE JURY: Your Honor, the jury has conferred. They've mediated, they've been over the case. We are at an impasse. We cannot get a unanimous decision.

This hasn't been an easy thing. We've discussed it openly. We've gone through all the evidence we have been given, both physically and in the courtroom.

We understand each other's opinion and each other's idea, and we are unable to give you a unanimous decision.

COURT: All right. Then the Court—do you think—do you feel now that further deliberations would be useless.

FOREMAN OF THE JURY: I have covered that in specific, and it's our general opinion that further deliberations will be useless.

COURT: All right, then. Court will withdraw Juror Number 12, then declare a mistrial.

The jury selected for the defendant's first trial was discharged by the trial court.

On 10 December 1984, the first day of the defendant's second trial on the charge of murdering her daughter, the trial court considered the defendant's motion to dismiss and made findings and conclusions concerning the necessity for the mistrial which had terminated the first trial four months earlier. It is readily apparent from the candid remarks of the trial court during its hearing on the defendant's motion, however, that the trial court had little independent recollection of the specific events which had led to the mistrial. Instead, the trial court was required to have the

court reporter testify from the stenographic record of the prior trial.

After making findings based in large part upon the court reporter's testimony, the trial court concluded that its first declaration of a mistrial during the previous trial of the defendant had been a "premature mistrial." The trial court further concluded that its comments to the jury immediately after the "premature mistrial" to the effect that the jury would never be able to reach a verdict and that another jury would have to consider and decide the case did not prejudice the defendant. The trial court then concluded that its final declaration of a mistrial terminating the first trial was a necessity because the jury had been "hopelessly deadlocked." Based upon its findings and conclusions, the trial court denied the defendant's motion to dismiss the charge against her on the ground of former jeopardy.

It has long been a fundamental principle of the common law of North Carolina that no person can be twice put in jeopardy of life or limb for the same offense. *E.g., State v. Birckhead,* 256 N.C. 494, 124 S.E. 2d 838 (1962); *State v. Prince,* 63 N.C. 529 (1869); *State v. Garrigues,* 2 N.C. 241 (1795). This principle has also been viewed as an integral part of the "law of the land" guarantees currently contained in article I, section 19 of the Constitution of North Carolina. *E.g., State v. Shuler,* 293 N.C. 34, 235 S.E. 2d 226 (1977); *State v. Crocker,* 239 N.C. 446, 80 S.E. 2d 243 (1954) (decided under former art. I, § 17). However, the principle is not violated where a defendant's first trial ends with a mistrial which is declared for a manifest necessity or to serve the ends of public justice. *State v. Simpson,* 303 N.C. 439, 447, 279 S.E. 2d 542, 547 (1981). "It is axiomatic that a jury's failure to reach a verdict due to a deadlock is a 'manifest necessity' justifying the declaration of a mistrial." *Id.* When a mistrial is declared properly for such reasons, "in legal contemplation there has been no trial." *State v. Tyson,* 138 N.C. 627, 629, 50 S.E. 456 (1905).

The decision to order a mistrial ordinarily rests with the sound discretion of the trial court. *State v. Odom,* 316 N.C. 306, 309, 341 S.E. 2d 332, 334 (1986). Under the common law of this State, however, a trial court in a capital case has no authority to discharge the jury without the defendant's consent and hold the defendant for a second trial, absent a showing of "manifest

necessity" for a mistrial. *Id.; State v. Birckhead*, 256 N.C. at 505, 124 S.E. 2d at 846-47; *State v. Crocker*, 239 N.C. at 449-50, 80 S.E. 2d at 246; *State v. Beal*, 199 N.C. 278, 294-95, 154 S.E. 604, 614 (1930); *State v. Ephraim*, 19 N.C. 162, 166 (1836). The common law of North Carolina has also long been that in trials for capital felonies it is the duty of the trial court when declaring a mistrial due to manifest necessity "to find the facts and set them out in the record, so that his conclusion as to the matter of law arising from the facts may be reviewed by this Court." *State v. Jefferson*, 66 N.C. 309 (1872). We have previously said:

> While it is stated repeatedly that the order of mistrial, even in capital cases, is a matter resting in the sound discretion of the trial judge, it is equally well settled that the findings of fact must be sufficient to warrant the exercise of this discretionary authority.

*State v. Crocker*, 239 N.C. at 451, 80 S.E. 2d at 246.

In 1977 the General Assembly extended the requirement of findings of fact to apply to all cases in which a mistrial was ordered.

> § 15A-1064. Mistrial, finding of facts required.
>
> Before granting a mistrial, the judge must make finding [sic] of facts with respect to the grounds for the mistrial and insert the findings in the record of the case.

N.C.G.S. § 15A-1064 (1983). As pointed out in the official commentary to this statute:

> This provision will be important when the rule against prior jeopardy prohibits retrial unless the mistrial is upon certain recognized grounds or unless the defendant requests or acquiesces in the mistrial. If the defendant requests or acquiesces in the mistrial, that finding alone should suffice.

We recently held that the findings required by the statute are mandatory, and that the failure to make them is error. *State v. Odom*, 316 N.C. at 311, 341 S.E. 2d at 335.

We must turn our attention then to the dispositive question of whether the findings of fact and conclusion of necessity made by the trial court in the present case, four months after the de-

fendant's first trial, provided a sufficient basis for the mistrial. If so, the trial court's denial of the defendant's motion to dismiss for reasons of former jeopardy was proper. Given the peculiar facts presented on appeal in this case, however, we are constrained to hold that the trial court's findings and conclusions were not sufficient.

The record on appeal clearly indicates that at the time the trial court withdrew a juror and initially declared a mistrial during the defendant's first trial in August, no necessity existed for such action. The jurors immediately made this clear to the trial court by their statements to the effect that, although they were tired and would like a recess, they had made progress toward a verdict and wished to continue their deliberations. With the benefit of hindsight not available to the trial court, we now can say that had it attempted to make the required findings prior to its initial declaration of a mistrial, the trial court would have discovered the actual position of the jury. It would not then have declared a mistrial where no necessity existed.

Upon hearing the objections of the jurors, the trial court immediately displayed commendable candor by acknowledging that it had made a mistake in declaring a mistrial. It then attempted to repair the damage by striking its withdrawal of a juror and attempting to reinstate the jury. This effort failed. We find it unnecessary to decide whether such an effort can ever be successful, however, and confine our consideration to the specific facts of this case.

Upon initially declaring a mistrial, the trial court unfortunately stated to the jury more than once that it did not believe that the jury could ever reach a verdict and that the case would be considered at some later time by another jury. It is impossible for us to know on appeal whether these comments by the trial court encouraged one or more wavering jurors to harden their positions and refuse to join in a verdict acquitting the defendant. The trial court faced this same handicap when it attempted to make findings and conclusions four months later. It is possible, however, to know that such comments by the trial court *may have* encouraged the jurors to pass the difficult decision facing them to another jury, because the trial court had stated that it did not expect the present jury to ever reach a verdict.

We can know with certainty only that the jury returned on the morning after the initial declaration of a mistrial and, after brief deliberations, reported to the trial court that they were unable to reach a verdict. At that time the trial court again declared a mistrial without making findings or conclusions concerning any necessity for its action. Although the trial court belatedly attempted to make the required findings and conclusions after receiving the defendant's motion to dismiss four months later, it is apparent that memories had dimmed by that time and that the trial court's efforts at independent recollection of the crucial events were unsuccessful.

Given the foregoing facts, it is clear that the initial declaration of a mistrial during the defendant's first trial on the capital charge against her was not the result of manifest necessity and, therefore, was error. We are unable to determine on the record before us whether the error in initially declaring a mistrial caused the jury to fail to reach agreement thereafter and deprived the defendant of a verdict. Therefore, we are required to hold that the trial court erred when it later denied the defendant's motion to dismiss the charge of murder in the first degree against her for the reason that she had formerly been placed in jeopardy for the same offense.

[2] The defendant did not object to either declaration of mistrial during her first trial. We recently held in *State v. Odom*, 316 N.C. 306, 341 S.E. 2d 332 (1986), a noncapital case, that a defendant is not entitled by reason of former jeopardy to dismissal of the charge against him, where he failed to object to the trial court's termination of his first trial by a declaration of mistrial. The requirement for such objections during the first trial, however, is neither expressed nor implied by the terms of N.C.G.S. § 15A-1064 which are mandatory in nature. Like other rules requiring objections at appropriate points in a trial, the rule we announced in *Odom* is a court-made rule designed to prevent avoidable errors and the resulting unnecessary appeals. We conclude, however, that the same rule should not be applied in capital cases. To strictly require such objections to mistrials in capital cases would require payment of a price too high even for the commendable result of improved judicial efficiency. *See generally, State v. Garrigues*, 2 N.C. 241 (1795) (a brief history of the abuses leading to

the acceptance in England and in North Carolina of the common law rule against double jeopardy in capital cases).

Further, we doubt that a great deal of judicial efficiency could be achieved by requiring objections to mistrials in capital cases. Capital cases are those cases "in which the death penalty may, but need not necessarily, be imposed." *State v. Barbour*, 295 N.C. 66, 70, 243 S.E. 2d 380, 383 (1978), *quoting with approval State v. Clark*, 18 N.C. App. 621, 624, 197 S.E. 2d 605, 607 (1973). Conviction of the offense charged in such cases must result in either a sentence of death or a sentence of imprisonment for life. N.C.G.S. § 15A-2000 (1983). Judgments in such cases are almost always appealable directly to this Court as a matter of right, and our experience has been that those convicted almost always take advantage of that right. N.C.G.S. § 7A-27(a) (1981).

In any event, we have previously indicated that "a charge of first degree murder carries with it the possibility of a sentence of death and must therefore be, and is, subject to additional safeguards." *State v. Strickland*, 307 N.C. 274, 291, 298 S.E. 2d 645, 657 (1983). Although the State's stipulation during the sentencing phase of the second trial caused the case against this defendant to lose its capital nature at that time, the case was a capital case throughout her first trial. Therefore, we conclude that in this case the defendant's failure to object to the termination of her first trial by a declaration of mistrial does not prevent her now receiving relief to which she otherwise is entitled on grounds of former jeopardy.

We also decline for an additional reason to apply the rule announced in *Odom* requiring that a defendant object to a mistrial or waive the right to present it later as a basis for an assignment of error on appeal. In *Odom* we emphasized that the record on appeal indicated that the defendant had been given notice and an opportunity to object to the mistrial before it was declared, and that the defendant made no argument that he was denied such opportunity. In the present case, however, both declarations of mistrial by the trial court were entered on the trial court's own motion and without prior notice or warning to the defendant. To require her to go through the formality of objecting after a mistrial had already been declared or lose her protection against double jeopardy would be a triumph of form over substance on these

facts. This is particularly true since the defendant properly raised the issue of former jeopardy before the commencement of the second trial by filing her written motion to dismiss the charge against her, and it was the trial court's denial of that motion which preserved this issue for appeal.

Obviously, we have decided this case on the facts arising from the specific record before us. We wish to make it clear, however, that this opinion does not address and is not dispositive of those cases in which manifest necessity for a mistrial clearly appears in the record, such as, for example, cases involving the death or incapacity of the trial judge occurring during the trial.

For the foregoing reasons, the declaration of a mistrial terminating the defendant's first trial was error, and the defendant was entitled to have her motion to dismiss granted. Accordingly, the judgment entered against the defendant by the trial court on 14 December 1984 must be vacated and the defendant discharged from custody. It is so ordered.

Judgment vacated.