An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA24-524

Filed 18 June 2025

Swain County, No. 19CRS050255-860

STATE OF NORTH CAROLINA

v.

DANIEL RYAN SUTTON

Appeal by Defendant from Judgment entered 6 September 2023 by Judge William H. Coward in Swain County Superior Court. Heard in the Court of Appeals 12 February 2025.

*Attorney General Jeff Jackson, by Special Deputy Attorney General Olga Vysotskaya de Brito, for the State.*

*Ellis & Winters LLP, by Michelle A. Liguori and Tyler C. Jameson, for Defendant-Appellant.*

HAMPSON, Judge.

## **Factual and Procedural Background**

Daniel Ryan Sutton (Defendant) appeals from a Judgment entered upon a jury verdict finding him guilty of First-Degree Murder. The Record before us, including evidence presented at trial, tends to reflect the following:

On 20 May 2019, Defendant was indicted for the willful, felonious, and

malicious murder of Jackie Thomasson. The matter came on for trial on 28 August 2023. The following day, twelve jurors and two alternate jurors were selected. After the jury was empaneled, two jurors were dismissed for cause. The two alternate jurors replaced the dismissed jurors—leaving no alternates for the remainder of trial, which the trial court anticipated would take two weeks. Three other jurors had stated they had potential scheduling conflicts that might arise during the trial. Due to the expectation that the trial would last two weeks, the potential scheduling conflicts of the three jurors, and the lack of remaining alternate jurors, the trial court declared a mistrial.

On 30 August 2023, the trial court commenced jury selection for a new trial. Defense counsel moved to dismiss on double-jeopardy grounds alleging the mistrial the day before was improperly allowed after a jury had been empaneled. The trial court denied this Motion.

At trial, the State's evidence tended to show on 10 May 2019, Jeremy Solomon picked up Autumn McCoy to take her to complete a drug test. Afterwards, Solomon drove with McCoy to meet up with Defendant. Solomon got out of the vehicle and spoke with Defendant briefly. Solomon got back into the vehicle and told McCoy he was "going to go collect some money." Defendant followed in his own vehicle.

At some point, both vehicles briefly pulled over on the side of the road. Defendant got out of his vehicle and approached Solomon's car. Solomon asked Defendant if he "needed a tool." Defendant said no but asked if Solomon "had a stick

or something", and Solomon "reached in the back seat and handed [Defendant] a stick object." Defendant took the stick and walked up an adjacent trail, while Solomon pulled off the side of the road and drove into a nearby residential driveway.

There was a truck in the driveway; Stephanie Crow was sitting in the passenger seat and Jackie Thomasson, the victim, was standing outside on the driver's side of the vehicle. Solomon approached Thomasson and confronted him about a dispute over the title to a vehicle Thomasson allegedly owed to Solomon. McCoy, who observed the incident from Solomon's car, testified the conversation got "heated[,]" and she saw Thomasson pull out a knife. Solomon pulled out a gun. Defendant "came from [behind] the front of the vehicle" and told Thomasson "to put the knife away." When Thomasson did not put the knife away, Defendant struck Thomasson over the head with the stick Solomon had given him. Thomasson picked up a shovel from the bed of the truck and swung it at Defendant. Defendant "blocked the hit" and hit Thomasson a second time. McCoy testified she then "covered [her] eyes for a moment" and when she opened them again, "[Thomasson] was kind of just knelt down in front of [Solomon's] car."

Defendant and Solomon retreated; Defendant told Thomasson "it didn't have to come to this[,]" and Solomon told Crow "it would happen to her next" if she "didn't get his money[.]" Defendant yelled to Crow that Thomasson needed to be taken to the hospital. Defendant walked back up the trail toward his vehicle, and Solomon got in his car with McCoy and left. Solomon, McCoy, and Defendant drove to

Defendant's home.

Around 1:00 p.m., Crow texted Officer Thomas Sutton "Call me quick." Officer Sutton called Crow, who was "in a panic." Crow told Officer Sutton "They're beating [Thomasson] with a bat."

Officers were dispatched to Defendant's home within thirty minutes of the incident. After obtaining a search warrant, a "wooden stick" was recovered from Defendant's vehicle. Officer Sutton also called 911 and requested assistance at Thomasson's home address.

Lieutenant Detective Andrew Bryant was dispatched to Thomasson's home. He observed "blood splatter" in the driveway. After entering the home, Lieutenant Bryant asked Crow if she "knew what happened" and she responded that she did. Lieutenant Bryant requested Crow come over to "a little kitchen area that was right off from the living room area" and began to question her.

Over defense counsel's objection, Lieutenant Bryant testified Crow told him that Solomon first punched Thomasson, then Thomasson pulled out a knife. Solomon threatened to shoot Thomasson. Crow did not see a gun but "knew" Solomon had one and saw "an impression of a firearm" in Solomon's waistband. According to Crow's statement, Defendant then "snuck up on" Thomasson and hit him over the head with "a wooden object." Crow told Lieutenant Byrant that Defendant "kept hitting" Thomasson until Solomon stopped him.

After talking to Crow, Lieutenant Bryant went to check on Thomasson. The

medical first responders had moved Thomasson from the living room to a bedroom. Lieutenant Bryant told himself he needed to "document this because it looked extremely serious." Lieutenant Bryant took pictures of Thomasson's injuries "in case it would . . . be a case that went to trial or something like that."

Thomasson was airlifted to a hospital and required surgery. He was subsequently placed on life support. After three to four days, his family chose to cease life support and Thomasson died shortly thereafter. Doctor Anne McDonald—who performed Thomasson's autopsy—testified, based on her examination, there was evidence of "blunt trauma," Thomasson could have been struck "up to five" times, and her opinion was that Thomasson died of "Blunt trauma of [the] head."

The State published six images of Thomasson's autopsy to the jury: (1) the top of Thomasson's head with the autopsy label and ruler, (2) the top and back of Thomasson's head, (3) the top of Thomasson's head after his surgical staples and sutures were removed, (4) the left side of Thomasson's head showing the surgical site and "evidence of blunt trauma[,]" (5) the left side of Thomasson's head internally, and (6) the left side of Thomasson's head with the skull cap removed. Defense counsel did not object to admission of any of the photographs.

At the close of the State's evidence, defense counsel moved to dismiss for insufficiency of the evidence. The trial court denied the Motion. During the charge conference, defense counsel requested the trial court instruct the jury on the lesser included offense of voluntary manslaughter. The trial court denied this request.

Defense counsel renewed its Motion to Dismiss after the jury was instructed. The trial court again denied this Motion.

On 6 September 2023, the jury returned a verdict finding Defendant guilty of First-Degree Murder. The trial court sentenced Defendant to the mandatory sentence of life imprisonment without the possibility of parole. On 8 September 2023, Defendant timely filed Notice of Appeal.

## Issues

The issues on appeal are whether the trial court erred by: (I) declaring a mistrial and denying the Motion to Dismiss alleging Double Jeopardy; (II) admitting Stephanie Crow's out-of-court statements; (III) admitting the six images of Thomasson's autopsy; (IV) denying Defendant's Motions to Dismiss the charge of First-Degree Murder; and (V) declining to instruct the jury on voluntary manslaughter.

## Analysis

I. Mistrial

"It is a fundamental principle of the common law, guaranteed by our Federal and State Constitutions, that no person may be twice put in jeopardy of life or limb for the same offense." *State v. Shuler*, 293 N.C. 34, 42, 235 S.E.2d 226, 231 (1977) (citations omitted); *see* U.S. Const. amend. V; N.C. Const. art. I, § 19. Under the Double Jeopardy Clause of the Fifth Amendment, "once a defendant is placed in jeopardy for an offense, and jeopardy terminates with respect to that offense, the

defendant may [not] be tried . . . a second time for the same offense." *Sattazahn v. Pennsylvania*, 537 U.S. 101, 106, 123 S. Ct. 732, 736, 154 L. Ed. 2d 588 (2003) (citation omitted). "In a criminal prosecution, jeopardy attaches when a jury is impaneled to try a defendant on a valid bill of indictment." *State v. Schalow*, 251 N.C. App. 334, 343, 795 S.E.2d 567, 574 (2016) (citations omitted).

"[T]he general rule is that an order of mistrial in a criminal case will not support a plea of former jeopardy." *State v. Battle*, 279 N.C. 484, 486, 183 S.E.2d 641, 643 (1971) (citation omitted). However, "where the order of mistrial has been improperly entered over a defendant's objection, defendant's motion for dismissal at a subsequent trial on the same charges must be granted." *State v. Odom*, 316 N.C. 306, 310, 341 S.E.2d 332, 334 (1986) (citations omitted).

"Whether a grant of a mistrial is manifestly necessary is a question that turns on the facts presented to the trial court." *Schalow*, 251 N.C. App. at 347, 795 S.E.2d at 576 (citation and quotation marks omitted). Moreover,

> [s]ince a declaration of a mistrial inevitably affects a constitutionally protected interest, the trial court must always temper the decision whether or not to abort the trial by considering the importance to the defendant of being able, once and for all, to conclude his confrontation with society through the verdict of a tribunal he might believe to be favorably disposed to his fate.

*Id.* (citation and quotation marks omitted). "As such, the trial court's discretion in determining whether manifest necessity exists is limited." *Id.* at 348, 795 S.E.2d at 576 (citations omitted). However, "the decision [to declare a mistrial] will not be

disturbed unless it is manifestly unsupported by reason, or it is so arbitrary that it could not have been the result of a reasoned decision." *State v. Shoff*, 128 N.C. App. 432, 434, 496 S.E.2d 590, 592 (1998) (citations and quotation marks omitted).

"Our courts have set forth two types of manifest necessity: physical necessity and the necessity of doing justice." *Schalow*, 251 N.C. App. at 348, 795 S.E.2d at 576 (citation and quotations omitted). "For example, physical necessity occurs in situations where a juror suddenly takes ill in such a manner that wholly disqualifies him from proceeding with the trial." *Id.* (citation omitted). "Whereas the necessity of doing justice arises from the duty of the [trial] court to guard the administration of justice from fraudulent practices and includes the occurrence of some incident of a nature that would render impossible a fair and impartial trial under the law." *Id.*, 795 S.E.2d at 576-77 (citation and quotation marks omitted).

Defendant argues this case is like *State v. Lachat*, 317 N.C. 73, 343 S.E.2d 872 (1986), where our Supreme Court held the trial court abused its discretion in declaring a mistrial over the defendant's objection. *Lachat* is readily distinguishable, however, because there the Court's determination turned on the trial court's failure to make findings of fact "showing that a mistrial was necessary[,]" and manifest necessity was not clear from the record. *Id.* at 74, 343 S.E.2d at 872. Here, by contrast, the trial court made oral and written findings that "The number of jurors is likely to be exhausted in the seating of the jury[.]"

The State, for its part, likens this case to *State v. Mathis*, 258 N.C. App. 651,

813 S.E.2d 861 (2018). In *Mathis*, the trial court declared a mistrial where "[o]ne juror was going to be absent the following day, and the trial court judge had 'absolutely no faith' in the alternate juror." 258 N.C. App. at 652, 813 S.E.2d at 862. On appeal, this Court held the issue was not preserved for review. *Id.* at 655-56, 813 S.E.2d at 864. We did, however, address the issue in the context of the defendant's claims for ineffective assistance of counsel. In doing so, we concluded the trial court "did not abuse its discretion in declaring a mistrial due to a manifest necessity." *Id.* at 656, 813 S.E.2d at 865. We reasoned there was a "combination of 'physical necessity' and the 'necessity of doing justice[,]' " *id.* at 657, 813 S.E.2d at 865, and concluded: "In light of our strict twelve juror requirement, the impending absence of juror number 8 . . . and the judge's belief that the alternate juror would be unable to perform his duties, the trial judge could have reasonably concluded that the completion of the . . . trial would not be fair and in conformity with the law." *Id.* at 658, 813 S.E.2d at 866.

Here, after the jury had been empaneled and opening statements were delivered, two jurors were struck for cause. The two alternate jurors were substituted in the places of the dismissed jurors. The trial court then *sua sponte* declared a mistrial because three other jurors indicated they had scheduling conflicts that would impede their ability to attend trial and the jury had no remaining alternate jurors. Defendant argues, because the trial ultimately only took four days, the three jurors

with scheduling conflicts "would have been available" through the first week and "likely part of the following week". Defendant, however, has the benefit of hindsight, which the trial court did not have. Instead, the trial court's decision to declare a mistrial turns on the facts presented to it at the time of its decision. *See Schalow*, 251 N.C. App. at 347, 795 S.E.2d at 576. Given that the trial court anticipated the trial would take two weeks, three jurors had impending scheduling conflicts, and there were no more alternate jurors available, we cannot say the trial court's decision to declare a mistrial was manifestly unsupported by reason. *See Shoff*, 128 N.C. App. at 434, 496 S.E.2d at 592; *Mathis*, 258 N.C. App. at 659, 813 S.E.2d at 866; *Odom*, 316 N.C. at 310, 341 S.E.2d at 334 (trial court did not abuse its discretion in declaring a mistrial relying in part on the jurors' own beliefs they would not be able to reach a unanimous verdict).

Thus, the trial court did not abuse its discretion in declaring a mistrial. Therefore, the mistrial was not improperly entered. Consequently, the trial court did not err in denying Defendant's Motion to Dismiss based on double jeopardy.

II.    <u>Crow's Out-of-Court Statements</u>

Defendant argues the trial court erred in admitting Crow's statements over his objections. We agree with Defendant that Crow's statements were admitted in violation of the Sixth Amendment but nonetheless conclude the admission of these statements is not reversible error.

The Sixth Amendment's Confrontation Clause "prohibits admission of

'testimonial' statements of a witness who did not appear at trial unless: (1) the party is unavailable to testify and (2) the defendant had a prior opportunity to cross-examine the witness." *State v. Glenn*, 220 N.C. App. 23, 25, 725 S.E.2d 58, 61 (2012) (citing *Crawford v. Washington*, 541 U.S. 36, 68, 124 S. Ct. 1354, 1374, 158 L. Ed. 2d 177, 203 (2004)).  Here, the parties do not dispute Crow was unavailable as a witness at the time of trial.  Rather, our analysis turns on whether Crow's statements were testimonial.

"Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency." *Davis v. Washington*, 547 U.S. 813, 822, 126 S. Ct. 2266, 2273, 165 L. Ed. 2d 224 (2006) (holding statements made to 911 operator were nontestimonial).  Other considerations as to whether a statement is testimonial include: (1) whether there were immediate threats to the declarant; (2) whether the declarant was speaking about events as they occur "rather than describing past events"; and (3) the formality of the questioning.  *State v. Lewis*, 361 N.C. 541, 546-47, 648 S.E.2d 824, 828 (2007) (discussing *Davis*, 547 U.S. at 826-27, 126 S Ct. at 2276-77).

In *State v. Sutton*, this Court concluded the victim's statement was testimonial where police approached and questioned the victim following an attempted robbery. The victim's statement to police "was neither spontaneous nor unsolicited.  It was, in fact, the second statement that she gave to police that night." *State v. Sutton*, 169

N.C. App. 90, 98, 609 S.E.2d 270, 275 (2005). This Court held the police questioning was an interrogation, "thus the statement produced by that questioning was testimonial." *Id.* Indeed, we have noted one police officer questioning a witness can constitute formal circumstances indicative of an interrogation. *Glenn*, 220 N.C. App. at 31, 725 S.E.2d at 65.

The trial court concluded Crow's statements were nontestimonial because there was an ongoing emergency and the questioning took place shortly after Thomasson had been assaulted. Likewise, on appeal, the State contends Crow's statements were nontestimonial because Crow was speaking to the police during an ongoing emergency. "[T]he existence of an ongoing emergency and its duration 'depend on the type and scope of danger posed to the victim, the police, and the public.' " *State v. McKiver*, 369 N.C. 652, 656, 799 S.E.2d 851, 854 (2017) (quoting *Michigan v. Bryant*, 562 U.S. 344, 371, 131 S. Ct. 1143, 1162, 179 L. Ed. 2d 93, 115 (2011)). "Although [a] defendant's location was unknown at the time of the interrogation . . . this fact does not in and of itself create an ongoing emergency." *State v. Lewis*, 361 N.C. at 549, 648 S.E.2d at 829 (citation omitted).

In *Bryant*, the victim—lying on the ground with a gunshot wound—made statements to responding police officers about the defendant. 562 U.S. at 349, 131 S. Ct. at 1150. At the time of the victim's statements, the defendant—armed with a gun—remained at-large with an unknown motive. *Id.* at 374, 131 S. Ct. at 1164. These circumstances constituted an ongoing emergency because the defendant was a

potential threat to law enforcement and the public. *Id.* at 373, 131 S. Ct. at 1164. In *Glenn*, this Court concluded there was no ongoing emergency even though the defendant was armed and his location was unknown. 220 N.C. App. at 30-31, 725 S.E.2d at 64-65. There, an officer responded to an alleged sexual assault. *Id.* at 29, 725 S.E.2d at 63. When the responding officer took the victim's statements, the assault was no longer ongoing and the victim had no signs of trauma. *Id.* Moreover, the defendant had voluntarily released the victim, was armed with a knife rather than a gun, and did not present a threat to the public because his motive was "sexual." *Id.* at 30-31, 725 S.E.2d at 64.

Here, Crow's statements given to police following the altercation were testimonial. Lieutenant Bryant approached Crow approximately twenty minutes after the altercation between Defendant, Solomon, and Thomasson. Crow was sitting in a safe space during the questioning. Although the Record reflects Crow was "crying", "shaking", and "extremely panicked" during the questioning, she was not facing any immediate threat nor had she suffered any physical injuries. *See Lewis*, 361 N.C. at 546-47, 648 S.E.2d at 828.

There was no ongoing emergency; although Defendant had fled the crime scene, his identity and specific motive—which did not suggest a threat to the police or public at-large—was known to law enforcement. In addition, like the defendant in *Glenn*, Defendant was armed with a stick rather than a gun. Further, law enforcement arrived at Defendant's home within thirty minutes of the assault. Thus,

because Crow's statements were testimonial and Defendant did not have an opportunity to cross-examine Crow, her statements should not have been admitted. *See Glenn*, 220 N.C. App. at 25, 725 S.E.2d at 61.

"A violation of the defendant's rights under the Constitution of the United States is prejudicial unless the appellate court finds that it was harmless beyond a reasonable doubt. The burden is upon the State to demonstrate, beyond a reasonable doubt, that the error was harmless." N.C. Gen. Stat. § 15A-1443(b) (2023). "When overwhelming evidence of guilt is presented against [a] defendant, the constitutional error may be harmless beyond a reasonable doubt." *Glenn*, 220 N.C. App. at 32, 725 S.E.2d at 65 (citation omitted) (holding testimonial statement was not harmless because "the State's evidence of defendant's guilt was not overwhelming").

In the case *sub judice*, the unchallenged evidence tended to show: Defendant armed himself with a stick prior to the altercation; Solomon got into a heated conversation with Thomasson about a car title, where Thomasson threatened Solomon with a knife and Solomon pulled out a gun in response; Defendant came up from behind Thomasson; Defendant told Thomasson "we just want what we paid for" and "put the knife away"; Defendant struck Thomasson in the head with the stick; Defendant struck Thomasson a second time after Thomasson swung a shovel at Defendant; police recovered the wooden stick at Defendant's house approximately thirty minutes after the assault.

Further, Crow's statements were not the only evidence Defendant had struck

- 14 -

Thomasson multiple times. McCoy testified she saw Defendant hit Thomasson twice before closing her eyes. Dr. McDonald testified Thomasson had five lacerations on his head and was struck with blunt force "up to five" times. Moreover, the evidence tends to show Defendant hit Thomasson the first time when Thomasson was threatening Solomon with the knife—not Defendant. Thus, contrary to Defendant's assertion, Crow's testimony was not the only evidence Defendant took "unprovoked swings" at Thomasson. Indeed, the evidence tends to show Defendant was not being threatened by Thomasson but chose to sneak up on Thomasson and threaten him with the stick.

Thus, even without Crow's statements, there was sufficient evidence of Defendant's guilt. Therefore, the admission of Crow's statements was harmless beyond a reasonable doubt. Consequently, the trial court did not reversibly err by admitting these statements.[1]

III.    Autopsy Photographs

Defendant argues the trial court erred in admitting photographs taken during Thomasson's autopsy. Specifically, Defendant argues the images were unduly prejudicial and lacked probative value.

---

[1] Because the trial court's admission of Crow's statements was harmless beyond a reasonable doubt, Defendant cannot show admission of the statements affected the outcome of his trial. Thus, we do not address whether the statements were erroneously admitted hearsay. *See* N.C. Gen. Stat. § 15A-1443(a) (2023) ("A defendant is prejudiced by errors relating to rights arising other than under the Constitution of the United States when there is a reasonable possibility that, had the error in question not been committed, a different result would have been reached at the trial out of which the appeal arises. The burden of showing such prejudice under this subsection is upon the defendant.").

"In general, the exclusion of evidence under the balancing test of Rule 403 of the North Carolina Rules of Evidence is within the trial court's sound discretion." *State v. Hennis*, 323 N.C. 279, 285, 372 S.E.2d 523, 527 (1988) (citations omitted). However, because Defendant did not object to the admission of the photographs at trial, he is limited to arguing plain error. N.C.R. App. P. 10(a)(4) (2024) ("In criminal cases, an issue that was not preserved by objection noted at trial . . . may be made the basis of an issue presented on appeal when the judicial action questioned is specifically and distinctly contended to amount to plain error.").

"For error to constitute plain error, a defendant must demonstrate that a fundamental error occurred at trial." *State v. Lawrence*, 365 N.C. 506, 518, 723 S.E.2d 326, 334 (2012) (citation omitted). Further, "[t]o show that an error was fundamental, a defendant must establish prejudice—that, after examination of the entire record, the error 'had a probable impact on the jury's finding that the defendant was guilty.' " *Id.* (quoting *State v. Odom*, 307 N.C. 655, 660, 300 S.E.2d 375, 378 (1983)). In other words, plain error requires a defendant to meet a three-factor test:

> First, the defendant must show that a fundamental error occurred at trial. Second, the defendant must show that the error had a probable impact on the outcome, meaning that absent the error, the jury probably would have returned a different verdict. Finally, the defendant must show that the error is an exceptional case that warrants plain error review, typically by showing that the error seriously affects the fairness, integrity or public reputation of judicial proceedings.

*State v. Reber*, 386 N.C. 153, 158, 900 S.E.2d 781, 786 (2024) (citations and quotation marks omitted).

- 16 -

Relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice[.]" N.C. Gen. Stat. § 8C-1, Rule 403 (2023). Evidence has no probative value if it adds nothing to the State's case. *See Hennis*, 323 N.C. at 286, 372 S.E.2d at 527. " 'Unfair prejudice' means an undue tendency to suggest a decision on an improper basis, usually an emotional one." *Id.* at 283, 372 S.E.2d at 526.

"[P]hotographs taken during an autopsy are generally deemed admissible[.]" *State v. Lynch*, 340 N.C. 435, 460, 459 S.E.2d 679, 691 (1995) (citation omitted). "[I]n a first-degree murder case, autopsy photographs are relevant even when such factors as the identity of the victim or the cause of death are not disputed." *State v. Skipper*, 337 N.C. 1, 35, 446 S.E.2d 252, 270 (1994) (citations omitted), *cert. denied*, 513 U.S. 1134, 115 S. Ct. 953, 130 L. Ed. 2d 895 (1995), *superseded on other grounds by statute*, N.C. Gen. Stat. § 15A-2002. "Photographs of a homicide victim may be introduced even if they are gory, gruesome, horrible or revolting, so long as they are used for illustrative purposes and so long as their excessive or repetitious use is not aimed solely at arousing the passions of the jury." *Hennis*, 323 N.C. at 284, 372 S.E.2d at 526 (citations omitted).

> The trial court's task is . . . to examine both the content and the manner in which photographic evidence is used and to scrutinize the totality of circumstances composing that presentation. What a photograph depicts, its level of detail and scale, whether it is color or black and white, a slide or a print, where and how it is projected or presented, the scope and clarity of the testimony it accompanies—these are all factors the trial court must examine

in determining the illustrative value of photographic evidence and in weighing its use by the state against its tendency to prejudice the jury.

*Id.* at 285, 372 S.E.2d at 527.

Defendant argues the photographs lack probative value because the State had "already had published crime-scene images of the wound" and the photographs "show surgical injuries" in addition to the injuries inflicted by Defendant. In support of his argument, Defendant cites *State v. Mercer*, where our Supreme Court noted it was inappropriate for the trial court to have admitted photographs of the victim's body at a funeral home after the State had already published crime scene photographs of the deceased victim. 275 N.C. 108, 121, 165 S.E.2d 328, 337 (1969), *overruled on other grounds by State v. Caddell*, 287 N.C. 266, 215 S.E.2d 348 (1975). The Court concluded the photographs had no probative value because the evidence was uncontradicted as to the cause of the victim's death, and thus the funeral home photographs were only "poignant and inflammatory." *Id.*

Similarly, in *Hennis*, the Supreme Court held that images showing visible protrusion of organs, caused by the process of decomposition, were erroneously admitted where "the majority of the twenty-six photographs taken at the victims' autopsies . . . added nothing to the state's case as already delineated in the crime scene slides and their accompanying testimony." 323 N.C. at 286, 372 S.E.2d at 528. Additionally, the photographs were "grotesque and macabre[,]" repetitious, and viewed on "an unusually large screen on a wall directly over defendant's head such

that the jury would continually have him in its vision as it viewed the slides[.]" *Id.*

Here, unlike *Mercer* and *Hennis*, the autopsy photographs were not excessive, irrelevant, or redundant. Rather, the Record tends to show the photographs were appropriately admitted to illustrate the medical examiner's testimony. Only six photos were admitted, and none was duplicative of another. Each photo was accompanied by Dr. McDonald's testimony explaining what the photo showed and how that contributed to her opinion as to Thomasson's cause of death. Defendant argues the "surgical injuries" shown in the photos may have confused the jury, but Dr. McDonald clearly explained which lacerations were surgical incisions versus the results of blunt trauma, and where the two overlapped. Nothing in the Record suggests the photos were introduced solely to arouse the passions of the jury. *See Hennis*, 323 N.C. at 284, 372 S.E.2d at 526. Thus, the trial court did not err by admitting the photographs. Therefore, in turn, the trial court did not plainly err by admitting the photographs.

IV.  Motions to Dismiss

"This Court reviews the trial court's denial of a motion to dismiss *de novo*." *State v. Smith*, 186 N.C. App. 57, 62, 650 S.E.2d 29, 33 (2007) (citation omitted). "Upon [a] defendant's motion for dismissal, the question for the Court is whether there is substantial evidence (1) of each essential element of the offense charged, or of a lesser offense included therein, and (2) of defendant's being the perpetrator of such offense. If so, the motion is properly denied." *State v. Fritsch*, 351 N.C. 373,

378, 526 S.E.2d 451, 455 (2000) (citation omitted). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *State v. Brown*, 310 N.C. 563, 566, 313 S.E.2d 585, 587 (1984) (citation omitted). "If the evidence is sufficient only to raise a suspicion or conjecture as to either the commission of the offense or the identity of the defendant as the perpetrator of it, the motion [to dismiss] should be allowed." *Fritsch*, 351 N.C. at 378, 526 S.E.2d at 455 (citation omitted).

"In making its determination, the trial court must consider all evidence admitted, whether competent or incompetent, in the light most favorable to the State, giving the State the benefit of every reasonable inference and resolving any contradictions in its favor." *State v. Rose*, 339 N.C. 172, 192, 451 S.E.2d 211, 223 (1994) (citation omitted). However, "[w]hether the State has offered such substantial evidence is a question of law for the trial court." *State v. McKinney*, 288 N.C. 113, 119, 215 S.E.2d 578, 583 (1975) (citations omitted).

Our General Statutes set out the offense of First-Degree Murder, in pertinent part, as follows:

> A murder which shall be perpetrated by means of . . . any . . . kind of willful, deliberate, and premeditated killing, . . . shall be deemed to be murder in the first degree[.]

N.C. Gen. Stat. § 14-17(a) (2023). Here, Defendant contends the trial court erred in denying his Motions to Dismiss because the State failed to present substantial evidence of premeditation, deliberation, and the specific intent to kill.

"Premeditation means that the act was thought out beforehand for some length of time, however short, but no particular amount of time is necessary for the mental process of premeditation." *State v. Bullock*, 326 N.C. 253, 257, 388 S.E.2d 81, 83 (1990) (citation omitted). "Deliberation means an intent to kill, carried out in a cool state of blood, in furtherance of a fixed design for revenge or to accomplish an unlawful purpose and not under the influence of a violent passion, suddenly aroused by lawful or just cause or legal provocation." *State v. Davis*, 349 N.C. 1, 33, 506 S.E.2d 455, 472 (1998) (citations omitted).

> Some of the circumstances from which premeditation and deliberation may be implied are (1) absence of provocation on the part of the deceased, (2) the statements and conduct of the defendant before and after the killing, (3) threats and declarations of the defendant before and during the occurrence giving rise to the death of the deceased, (4) ill will or previous difficulties between the parties, (5) the dealing of lethal blows after the deceased has been felled and rendered helpless, (6) evidence that the killing was done in a brutal manner, and (7) the nature and number of the victim's wounds.

*State v. Olson*, 330 N.C. 557, 565, 411 S.E.2d 592, 596 (1992) (citing *State v. Gladden*, 315 N.C. 398, 430-31, 340 S.E.2d 673, 693 (1986)).

In the case *sub judice*, there is sufficient evidence tending to show Defendant acted with premeditation and deliberation. First, Defendant and Solomon planned to confront Thomasson, and Defendant did so armed with a wooden stick. Thus, there was evidence Defendant's actions were thought out beforehand. *See Bullock*, 326 N.C. at 257, 388 S.E.2d at 83. Second, there was evidence of ill will between the

parties, as Defendant and Solomon purposefully confronted Thomasson over a personal conflict. *See Olson*, 330 N.C. at 565, 411 S.E.2d at 596. Third, the brutality of the killing, caused by blunt force trauma to the head, also suggests Defendant's actions were premeditated and deliberate. *See id.* Fourth, McCoy testified Defendant struck Thomasson at least twice, and Dr. McDonald testified Defendant could have struck Thomasson "up to five" times. Finally, Defendant snuck up on Thomasson and threatened him with the stick while Thomasson was threatening Solomon. In fact, the evidence shows Defendant intentionally took an alternative route to come up from behind Thomasson—such that Thomasson would not have been aware of Defendant's presence when Defendant first approached him with the stick. Thus, viewed in the light most favorable to the State, there was more than mere suspicion or conjecture that Defendant acted with premeditation and deliberation. *See Fritsch*, 351 N.C. at 378, 526 S.E.2d at 455 (citation omitted).

Defendant further contends the State failed to offer substantial evidence he had the specific intent to kill Thomasson. "To show the 'specific intent to kill' required to prove first-degree murder, the State must show more than an intentional act by the defendant resulting in the death of the victim; the State also must show that the defendant intended for his action to result in the victim's death." *State v. Keel*, 333 N.C. 52, 58, 423 S.E.2d 458, 462 (1992). Thus, "[t]he specific intent to kill is a necessary component of deliberation[.]" *Id.* (citing *State v. Jackson*, 317 N.C. 1, 23, 343 S.E.2d 814, 827 (1986), *cert. granted and judgment vacated on other grounds*, 479

U.S. 1077, 107 S. Ct. 1271, 94 L. Ed. 2d 133 (1987)). Therefore, because the State presented sufficient evidence of deliberation, it also presented sufficient evidence of Defendant's specific intent to kill. *See id.* Consequently, the trial court properly denied Defendant's Motions to Dismiss.

V. Voluntary Manslaughter Instruction

Defendant argues the trial court erred by declining to instruct the jury on the lesser-included offense of voluntary manslaughter.

"First-degree murder is the unlawful killing—with malice, premeditation and deliberation—of another human being." *State v. Arrington*, 336 N.C. 592, 594, 444 S.E.2d 418, 419 (1994) (citations omitted). Voluntary manslaughter is a lesser-included offense of first-degree murder. *State v. Woodard*, 324 N.C. 227, 232, 376 S.E.2d 753, 756 (1989) (citation omitted). "A jury must be instructed on a lesser included offense only when evidence has been introduced from which the jury could properly find that the defendant had committed the lesser included offense." *Id.* (citation omitted). "In order to receive an instruction on voluntary manslaughter, there must be evidence tending to show '[a] killing [was] committed in the heat of passion suddenly aroused by adequate provocation, or in the imperfect exercise of the right of self-defense[.]'" *State v. Vincent*, 195 N.C. App. 761, 765, 673 S.E.2d 874, 876 (2009) (alterations in original) (quoting *State v. Huggins*, 338 N.C. 494, 497, 450 S.E.2d 479, 481 (1994)).

Here, the trial court instructed the jury on First-Degree Murder, Second-

Degree Murder, and perfect self-defense. Nonetheless, Defendant contends the jury should also have been instructed on imperfect self-defense. Defendant argues, because the jury was not instructed on imperfect self-defense, it "did not have the opportunity to decide whether voluntary manslaughter was the appropriate conviction." However, as Defendant acknowledges, "[t]his Court has adopted the rule that when the trial court submits to the jury the possible verdicts of first-degree murder based on premeditation and deliberation, second-degree murder, and not guilty, a verdict of first-degree murder based on premeditation and deliberation renders harmless the trial court's improper failure to submit voluntary or involuntary manslaughter." *State v. Price*, 344 N.C. 583, 590, 476 S.E.2d 317, 321 (1996) (citation omitted).

Moreover, Defendant has not shown he was entitled to an instruction on imperfect self-defense. "[F]or a defendant to establish entitlement to an instruction on perfect or imperfect self-defense, two questions must be answered in the affirmative: (1) Is there evidence that the defendant in fact formed a belief that it was necessary to kill his adversary in order to protect himself from death or great bodily harm, and (2) if so, was that belief reasonable? If both queries are answered in the affirmative, then an instruction on self-defense must be given." *State v. Harvey*, 372 N.C. 304, 308, 828 S.E.2d 481, 484 (2019) (citation omitted).

Here, no evidence tends to show Defendant reasonably believed it was necessary to strike Thomasson to protect himself from imminent death or great bodily

harm. *See id.* at 309, 828 S.E.2d at 484 (defendant was not entitled to instruction on imperfect self-defense where he "never represented that [the victim's] actions in the moments preceding the killing had placed defendant in fear of death or great bodily harm such that defendant reasonably believed that it was necessary to fatally stab [the victim] in order to protect himself."); *State v. Locklear*, 349 N.C. 118, 155, 505 S.E.2d 277, 298 (1998) (the defendant "offered no evidence that at the time of the shooting he believed, reasonably or unreasonably, that it was necessary to kill the victim in order to protect himself from imminent death or great bodily harm."). Rather, the evidence tended to show Thomasson was threatening Solomon with the knife, not Defendant; Defendant snuck up on Thomasson from behind; and Thomasson was wielding a pocketknife, rather than a gun or other weapon that could be used against Defendant from a distance.

Thus, Defendant failed to produce sufficient evidence he reasonably believed it was necessary to strike Thomasson to protect himself from imminent death or great bodily harm. Therefore, he did not produce sufficient evidence he was acting in imperfect self-defense to support an instruction on voluntary manslaughter. Consequently, the trial court did not err in declining to instruct the jury on voluntary manslaughter.

## **Conclusion**

Accordingly, for the foregoing reasons, we conclude there was no prejudicial error in Defendant's trial and affirm the Judgment.

NO ERROR.

Judges TYSON and GRIFFIN concur.

Report per Rule 30(e).